DAYTON POWER & LIGHT Co., APPELLANT, v. LINDLEY, TAX COMMR., APPELLEE.

(No. 78-1207—Decided June 27, 1979.)

*Messrs. Porter, Wright, Morris & Arthur* and *Mr. Roger F. Day*, for appellant.

*Mr. William J. Brown*, attorney general, and *Ms. J. Elaine Bialczak*, for appellee.

CELEBREZZE, C. J. The appellant has raised one proposition of law that is expressed as follows: "The Ohio Coal Consumption Tax discriminates against interstate commerce in violation of the Commerce Clause of the United States Constitution."

The underlying purpose of the Commerce Clause is to facilitate free trade between the states. In order to effectively achieve that objective the United States Supreme Court has consistently held that a state may not impose a taxing scheme that discriminates against such commerce by establishing a direct advantage to its local economy. This cardinal rule of constitutional law was succinctly summarized by Justice White in *Boston Stock Exchange* v. *State Tax Commission* (1977), 429 U. S. 318, at page 329, as follows:

"On various occasions when called upon to make the delicate adjustment between the national interest in free and open trade and the legitimate interest of the individual States in exercising their taxing powers, the Court has counseled that the result turns on the unique characteristics of the statute at issue and the particular circumstances in each case. *E. g., Freeman* v. *Hewit, supra* [(1946), 329 U. S. 249], at 252. This case-by-case approach has left 'much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation.' *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 457 (1959). Nevertheless, as observed by Mr. Justice Clark in

the case just cited: '[F']rom the quagmire there emerge
. . . some firm peaks of decision which remain unquestion-
ed.' *Id.*, at 458. Among these is the fundamental principle
that we find dispositive of the case now before us: No
State, consistent with the Commerce Clause, may 'impose
a tax which discriminates against interstate commerce
. . . by providing a direct commercial advantage to local
business.' *Ibid.* See, also, *Halliburton Oil Well Co.* v. *Reily,*
373 U. S. 64 (1963); *Nippert* v. *Richmond,* 327 U. S. 416
(1946); *I. M. Darnell & Son* v. *Memphis,* 208 U. S. 113
(1908); *Guy* v. *Baltimore,* 100 U. S. 434, 443 (1880); *Wel-
ton* v. *Missouri,* 91 U. S. 275 (1876). The prohibition
against discriminatory treatment of interstate commerce
follows inexorably from the basic purpose of the Clause.
Permitting the individual States to enact laws that favor
local enterprises at the expense of out-of-state businesses
'would invite a multiplication of preferential trade areas
destructive' of the free trade which the Clause protects.
*Dean Milk Co.* v. *Madison,* 340 U. S. 349, 356 (1951)."

The philosophy behind the prohibition against discrim-
ination was articulately expressed by Justice Cardozo in
*Baldwin* v. *G. A. F. Seelig, Inc.* (1935), 294 U. S. 511, at
page 523:

"The Constitution was framed under the dominion of
a political philosophy less parochial in range. It was fram-
ed upon the theory that the peoples of the several states
must sink or swim together, and that in the long run pros-
perity and salvation are in union and not division."

Moreover, the specter of discrimination may arise
from the face of the statute or it may appear more subtly in
its practical application. The latter concern with the "prac-
tical operation" of a legislative enactment was enunciated
in *Best & Co.* v. *Maxwell* (1940), 311 U. S. 454, at pages
455-456, as follows:

"The commerce clause forbids discrimination, wheth-
er *forthright or ingenious.* In each case it is our duty to
determine whether the statute under attack, whatever its
name may be, will in its *practical* operation work discrim-

ination against interstate commerce." (Emphasis added.)

The intent behind the statute is by no means the decisive factor when its operative effect is unduly discriminatory as the court reiterated, six years later, in *Nippert* v. *Richmond, supra* (327 U. S. 416), at page 434: "The tax here in question inherently involves too many probabilities, and we think actualities, for exclusion of or discrimination against interstate commerce, in favor of local competing business, to be sustained in any application substantially similar to the present one. *Whether or not it was so intended, those are its necessary effects.*" (Emphasis added.) In addition, this judicial concern with the "actuality of operation," a pervasive theme running through Supreme Court review of state taxation cases, "extends to every aspect of the tax operations." *Halliburton Oil Well Co.* v. *Reily, supra* (373 U. S. 64), 69.

Just last year the Supreme Court upheld the ban against "economic protectionism" by declaring that where such is the effect of a state statute "a virtually *per se* rule of invalidity has been erected." *Philadelphia* v. *New Jersey* (1978), 437 U. S. 617, 624.

Where there is both an evenhanded regulation and a purely "incidental" effect on interstate commerce, state legislation may pass constitutional muster. As the court indicated further at page 624:

" * * * But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142:

" 'Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits . . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the

local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.'

"See also *Raymond Motor Transportation, Inc.,* v. *Rice, supra* [434 U. S. 429], 441-442; *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333, 352-354; *Great A & P Tea Co.* v. *Cottrell,* 424 U. S. 366, 371-372."

This court has had two occasions within the past year to pass on a challenge to legislation as being violative of the Commerce Clause. In both instances we found a constitutional infirmity to exist. In *Panhandle Eastern Pipeline Co.* v. *Pub. Util. Comm.* (1978), 56 Ohio St. 2d 334, we held that when the effect of the requirement embodied in R. C. 4905.40 through 4905.42, that a public utility may not issue securities with a maturity exceeding one year without first obtaining approval of the Public Utilities Commission, places an undue burden on interstate commerce, the application of the statutory scheme violates the Commerce Clause of the United States Constitution.

In addition, in a more closely analogous decision which also involved an appeal from the Board of Tax Appeals, we held an Act of the General Assembly violative of the federal Constitution in *American Modulars Corp.* v. *Lindley* (1978), 54 Ohio St. 2d 273, certiorari denied, 99 S. Ct. 281. In that appeal we were dealing with the "use tax" imposed by R. C. 5741.021, and we held, at page 273, that "[i]nsofar as the application of R. C. 5741.021 imposes a higher tax rate on property purchased out of state and used in a taxing county than on similarly used property purchased in the state, that statute discriminates against interstate commerce and violates the Commerce Clause of the United States Constitution." In that unanimous opinion, written by Justice William B. Brown, we specifically reaffirmed the aforementioned legal principle, enunciated in *Best & Co., supra,* that it is the actual operative effect of a statute that often involves the critical inquiry. Citing that decision we indicated, at page 278: "Finally, the fact that R. C. 5741.021 discriminates against interstate commerce only in its *practical effect* does not

bar a finding that it is unconstitutional.'' (Emphasis added.)

With the applicable precedent in mind, a scrutiny of the current legislative scheme before us reveals its constitutional flaws.

Effective December 14, 1977, Am. Sub. H. B. No. 415 was enacted and, as part of that bill, the new Ohio Coal Use Tax came into being. Both the purpose of the legislation and the various rates to be assessed are set forth in R. C. 5751.02(A) as follows:

"For the purpose of paying the expense of administering the functions of the department of energy for the 1978-1979 fiscal biennium and financing coal-related research or any improvements designed to enable the substitution of coal or an alternative fuel, other than natural gas, for natural gas or a petroleum fuel, the conversion of coal to other fuels, or the combustion of high sulfur coal in compliance with air or water pollution control or solid waste disposal law, including but not limited to facilities for processing coal to remove sulfur before combustion of the coal, for fluidized bed combustion, or for removal of the sulfur before the products of combustion are emitted or discharged, an excise tax is hereby levied on all storage, use, or other consumption in this state of coal in excess of two hundred tons in the calendar year used directly for generating steam or electric power, at the rate of forty cents per ton for coal that as delivered has a sulfur content of less than one-half of one percent by weight expressed as elemental sulfur; thirty-five cents per ton for coal with a sulfur content of one-half of one percent or more, but less than one per cent; thirty cents per ton for coal with a sulfur content of one per cent or more, but less than one and one-half per cent; and fifteen cents per ton for coal with a sulfur content of one and one-half per cent or more, except that the tax levied on coal that has been processed to remove sulfur before combustion of the coal shall be calculated on the basis of the sulfur content of the coal before it was processed.''

An initial observation that can be drawn from an analysis of the statutory language is that the coal tax was established to apply only to large consumers of coal since the first 200 tons consumed are exempted from the tax. It is also evident that the tax was directed only at those industries which consumed coal for the purpose of generating electricity or steam.

An examination of the pertinent language in R. C. 5751.02(A) reveals a scheme of taxation that increases as the relative sulphur content of the coal decreases. The graduation in the tax rates can be summarized as follows:

| Tax Rate Per Ton | Sulphur Content |
|---|---|
| $ .40 | Under 0.5% |
| $ .35 | 0.5% up to 1% |
| $ .30 | 1 % up to 1.5% |
| $ .15 | 1.5% up and higher |

Any semblance of facial neutrality disappears in light of the facts relating to the geographical location and ability to mine low-sulphur coal in Ohio. In testimony before the board, Harry Perry, a former director of research for the United States Bureau of Mines, provided considerable data on the coal industry. He testified that during 1976, 99.1 percent of the electric current generated in Ohio was produced by coal-fired generators. Furthermore, he indicated that based upon projected growth and demand for electric current, Ohio's electric utilities will require even greater supplies of coal in the coming years.

He presented statistics from the United States Bureau of Mines showing Ohio as having coal reserves in excess of 17 billion tons in the "high sulphur" category, i. e., with a sulphur content of 1.5 percent or more. Moreover, his testimony revealed that no more than 2 percent of Ohio's inferred coal reserves are believed to have a sulphur content under 1.5 percent. In contrast to that paucity of low sulphur coal in this state there is an abundance of that commodity in the western part of the United States and in the states of Kentucky, North Carolina, Tennessee, West Virginia, and Virginia.

Julian E. Tobey, Jr., a coal consultant from Cleveland, also testified that there was "no significant mining of low sulphur coal" in Ohio. He indicated that although some low sulphur coal deposits were still in existence in this state, they exist only:

" * * * in small patches which are generally not economically minable or it exists in some portion of an overall minable property where the sulfur may range in the seam being mined from perhaps as low as 1.2 or 1.4 to three and [a] half or four [percent] and have a mean value of two or two and a half, [or] 2.7 [percent]. * * * It has to be mined as part of the overall operation, and it is all mixed together and averaged out."

He also noted that existing seams of Ohio low sulphur coal "* * * tend to be thin, dirty * * * inconsistent as to thickness * * *. They pinch out, and they represent very difficult, expensive mining conditions."

It is true that some foreign high sulphur coal will be consumed in Ohio and taxed at the lower rate just as some Ohio-produced low sulphur coal will also be consumed here and taxed at the higher rates. However, because of the relative presence of these two types of coal in Ohio these would be nominal amounts.

The "reality" of the situation is such that Ohio high sulphur coal and foreign low sulphur coal compete in the Ohio market place. During 1977, Ohio electric utilities, a major category subject to the new coal tax, acquired over 40 million tons of high sulphur coal, 80.2 percent of which came from Ohio mines, and over 12 million tons of low sulphur coal, only 6.2 percent of which came from mines within this state. As indicated earlier, because of the virtual absence of low sulphur coal in this state and the expensive process of getting to that which is present, that type of coal *must* come from outside the state. Thus, as the appellant has perceptively pointed out, the high sulphur-low tax rate structure is just as discriminatory, *in effect,* as if a tax rate of $ .15 per ton had been imposed on the consumption of all *Ohio* coal, and a $ .30 or

higher rate had been imposed on the consumption of all *non-Ohio* low sulphur coal.

As were all the discriminatory taxing measures previously held to be constitutionally invalid by the United States Supreme Court, the present tax "falls short of the substantially even-handed treatment demanded by the Commerce Clause." *Boston Stock Exchange, supra* (429 U. S. at 332). Nor could its effect on interstate commerce be considered merely "incidental" despite the presence of a legitimate local public interest advanced to support the recent enactment.

Thus, a review of the rate structure embodied in R. C. 5751.02, the economic reality of Ohio's coal industry, and the geographic location of low sulphur coal in this part of the country, reveals the discriminatory effect imposed upon interstate commerce by the application of the tax. Putting all these factors together it becomes clear, as the appellant has argued, that the tax encourages the purchase of Ohio high sulphur coal and discourages the purchase of out-of-state low sulphur coal. In other words, those who buy the local product are rewarded in the form of a lower tax rate, while those who do not must suffer the burden of a higher tax rate. The "practical effect" of the new tax is, therefore, to divert business away from foreign producers of low sulphur coal.

Appellee has responded to appellant's arguments with a two-pronged answer. Initially, it is asserted that a taxpayer has a heavy burden when challenging a statute on equal protection grounds. See, *e. g., Madden* v. *Kentucky* (1940), 309 U. S. 83; *Allied Stores of Ohio, Inc.,* v. *Bowers* (1959), 358 U. S. 522; *Lehnhausen* v. *Lake Shore Auto Parts Co.* (1973), 410 U. S. 356. Contending that principle is dispositive, appellee asserts that a statutory classification based on sulphur content is rationally related to the legitimate governmental objective of encouraging research into environmentally safe ways of utilizing high sulphur coal.

We agree with appellant that were the issue in this cause grounded upon an alleged violation of the Equal Protection Clause of the United States Constitution ap-

pellee's argument would be pertinent. However, since the crux of this appeal is devoted to an analysis of the Commerce Clause, appellee's contention is simply inapplicable.

Appellee's major argument in support of the coal tax is that it constitutes a valid levy on an in-state event, *i. e.*, the "use" of the coal after all aspects of interstate commerce have terminated, and, therefore, the Commerce Clause affords no protection. A similar argument was raised and rejected in support of a tax statute in *Boston Stock Exchange, supra*, at pages 332-33, at fn. 12, where the Supreme Court held that the key inquiry is whether the tax was imposed on the basis of some "foreign" element:

"Because of the discrimination inherent in Section 270-a [the New York tax statute], we also reject the Commission's argument that the tax should be sustained because it is imposed on a local event at the end of interstate commerce. While it is true that, absent an undue burden on interstate commerce, the Commerce Clause does not prohibit the States from taxing the transfer of property within the State, the tax may not discriminate between transactions on the basis of some interstate element. *International Harvester Co.* v. *Department of Treasury*, 322 U. S. 340, 347-348 (1944). As was held in *Welton* v. *Missouri*, 91 U. S. 275, 282 (1876), '[t]he commercial power [of the federal government] continues until the commodity has ceased to be the subject of discriminating legislation by reason of its foreign character. That power protects it, even after it has entered the State, from any burdens imposed by reason of its foreign origin.' "

See, also, *American Modulars Corp., supra* (54 Ohio St. 2d 273). Or, as it has been enunciated elsewhere, judicial scrutiny should be directed not only at whether the item is still in transit or has actually come to rest, but whether the tax is " 'discriminating in its incidence against the merchandise because of its *origin in another state*.' " *Baldwin* v. *G. A. F. Seelig, supra* (294 U. S. 511), at page 526, quoting *Sonneborn Bros.* v. *Cureton* (1923), 262 U. S. 506, 516. (Emphasis added.)

It is only a tax that is "non-discriminatory in opera-

tion'' that will survive the rigorous standards of the Commerce Clause and may lawfully be imposed:

"Things acquired or transported in interstate commerce may be subjected to a property tax, non-discriminatory in its operation, when they have become part of the common mass of property within the state of destination." *Henneford* v. *Silas Mason Co.* (1937), 300 U. S. 577, 582.

Due to the virtual absence of low sulphur coal in Ohio, the practical effect of this particular tax is that it is discriminatory in its operation because of the geographical "origin" of that higher taxed entity outside this state. Hence, it is not a uniform or evenhanded tax such as that upheld in *McGoldrick* v. *Berwind-White Coal Mining Co.* (1940), 309 U. S. 33, and appellee's reliance thereon is not persuasive.

We agree with the stated objective of the tax to promote an increased use of Ohio high sulphur coal by developing improved methods of coal processing and conversion through research. Furthermore, we support those attempts to fund coal research so that the abundance of high sulphur coal in this state can be profitably consumed and the jobs of Ohio coal miners remain intact.[1]

---

[1] On May 7, 1979, Judge H. David Hermansdorfer of the United State District Court for the Eastern District of Kentucky upheld the constitutionality of Section 7425, Title 42, U. S. Code, part of the Clean Air Amendments of 1977 passed by the United States Congress. *McCoy Elkhorn Coal Corp.* v. *United States Environmental Protection Agency, et al.*, No. 79-9.

The Act deals with the problem of unemployment and provides that certain executive officers may, in order to "* * * prevent or minimize significant local or regional economic disruption or unemployment," "prohibit * * * [certain power plants] from using fuels other than locally or regionally available coal or coal derivatives to comply with implementation plan requirements." Sections 7425(a)(3) and (b)(3), Title 42, U. S. Code.

The Governor of Ohio and the state of Ohio had intervened as parties defendants in that action contending, in essence, "that economic disruption in the Ohio coal industry attributable to the Clean Air Act impacts substantially upon coal related jobs, the Ohio utilities and their customers, and the State's treasury not only in terms of lost revenue but in terms of the prospective drainage of enormous amounts of money from unemployment type accounts."

The judiciary is not concerned with a legislative purpose that encourages "intrastate commerce and industry" or fosters interstate competition. It is only when the *means* by which that legitimate purpose is to be accomplished flies in the face of the United States Constitution that the judicial branch must become involved:

"Our decision today does not prevent the states from structuring their tax systems to encourage the growth and development of intrastate commerce and industry. Nor do we hold that a State may not compete with other states for a share of interstate commerce; such competition lies at the heart of a free trade policy. We hold only that *in the process of competition, no State may discriminatorily tax a product manufactured or the business operations performed in any other State."* (Emphasis added.) *Boston Stock Exchange, supra,* at 336-37. For this court to place a judicial stamp of approval on the statutory scheme of taxation now before us would be to shirk our sworn duty, as members of the judicial branch of government, to support the Constitution of the United States.

Two separate bills have already been introduced into the General Assembly to provide a more uniform tax rate to accomplish those same legitimate, legislative objectives.[2] The ready availability of such broad range, non-discriminatory alternatives provides further reason for declaring the tax invalid under the Commerce Clause. See, *Great Atlantic & Pacific Tea Co.* v. *Cottrell* (1976), 424 U. S. 366, 377; *Dean Milk Co.* v. *Madison, supra* (340 U. S. 349), at page 354.

Accordingly, and in light of all the foregoing, we agree with appellant's contention that the Ohio Coal Consumption Tax, imposed by R. C. 5751.02, is in violation of the

---

[2]On March 28, 1979, S. B. No. 140 was introduced by Messrs. Speck, Milleson and Collins to amend R. C. 5751.02 to set the coal consumption tax rate at $.25 per ton repealing the former rate structure based on gradations of sulphur content. In addition, on May 15, 1979, H. B. No. 613 was introduced by Messrs. Carney, Bowers, Gilmartin, Fries and Skeen to amend R. C. 5751.02 to set the coal tax rate at a uniform figure of $.75 per ton again doing away with the previous classification based on high or low sulphur content.

478

Commerce Clause of the United States Constitution (Section 8, Clause 3, of Article I). The decision of the Board of Tax Appeals is hereby reversed.

*Decision reversed.*

W. Brown, Sweeney and Locher, JJ., concur.
Herbert, P. Brown and Holmes, JJ., dissent.