**OPUS III–VII CORPORATION, Appellant,**

v.

**OHIO STATE BOARD OF PHARMACY, Appellee.**

[Cite as *OPUS III–VII Corp. v. Ohio State Bd. of Pharmacy* (1996), 109 Ohio App.3d 102.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 95APE05–595.

Decided Feb. 1, 1996.

104

Squire, Sanders & Dempsey, William M. Todd and Robert C. Maier, for appellant.

Betty D. Montgomery, Attorney General, Lawrence D. Pratt and Robert J. McClaren, Assistant Attorneys General, for appellee.

PETREE, Judge.

This matter is before this court upon the appeal of plaintiff, OPUS III–VII Corporation ("OPUS"), from a judgment of the Franklin County Court of Common Pleas denying OPUS's request for injunctive and declaratory relief.

Upon appeal, OPUS sets forth four assignments of error:

"I. The common pleas court erred by deferring to the Pharmacy Board's power to interpret the meaning of 'unopened' in its own rule where the alleged 'interpretation' is plainly inconsistent with the express language of the rule, O.A.C. § 4729–9–04.

"II. The common pleas court erred by affirming a 'determination' by the Pharmacy Board where no procedures or substantive criteria for such 'determination' had ever been properly rule-filed and adopted pursuant to R.C. § 119.03.

"III. The common pleas court erred by affirming the Board's ad hoc 'determination' regarding OPUS' unit dose system where no statute or administrative rule provides for such 'determination' as part of the board's power to regulate the practice of pharmacy.

"IV. The common pleas court erred by finding that the Pharmacy Board's pronouncement concerning OPUS products complies with equal protection requirements where OPUS' products were discriminatorily singled out for such treatment, where no prior or subsequent 'determinations' addressed the status of products marketed by OPUS' competitors, and where no official standards furnished any rational basis for so treating OPUS' products."

The essential facts of this case are not in dispute, having been stipulated by the parties. In December 1993, defendant, Ohio State Board of Pharmacy ("board"), received a facsimile inquiry from one of its licensed terminal distributors, Malcolm Meyer, Manager of HSI–LTC, regarding whether unused medications dispensed in OPUS's unit dose system could be returned for credit and subsequently redispensed to other patients, under the terms of Ohio Adm.Code 4729–9–04.[1]

Ohio Adm.Code 4729–9–04 governs the return and redispensing of medications by a pharmacy after (1) those medications have been sent out by the pharmacy for dispensing to patients in an institutional setting; and (2) have been returned unused to the pharmacy. The rule provides that in order for drugs that have been returned to the pharmacy to be reused the system must be (a) both

---

1. OPUS manufactures and sells containers and dispensers, known as unit dose systems, for administering prescription medication to patients in institutional settings such as nursing homes.

"unopened" and "single dose"; or (b) "unopened" and "hermetic," and the medication must not have been in the possession of the ultimate user (the patient).

The board has no established official procedures for responding to requests from licensed terminal distributors, but generally furnishes whatever official resolutions or determinations the board has made regarding the subject matter of the inquiry. In instances where the board has made no official determination or resolution, the subject matter of a request may be submitted to the board for the purpose of having the board make an official determination or resolution.

Because the board was unfamiliar with the OPUS system, in order to respond to the inquiry, Nancy Little, the board's licensing administrator, contacted OPUS and arranged for OPUS's representatives to make a presentation to the board regarding their unit dose system at the board's headquarters on January 11, 1994. Although members of the board itself were not present and made no official determination or resolution regarding the system, the board's staff, after review of Ohio Adm.Code 4729–9–04, felt that drugs used in the OPUS system could not be returned for credit and subsequently redispensed to other patients after return to the pharmacy from an institutional setting.

As a result, on January 27, 1994, Little advised the licensee, Meyer, that there were problems with the OPUS system and that it did not meet the requirements of Ohio Adm.Code 4729–9–04.

On February 14, 1994, counsel for OPUS drafted a letter to the board indicating that OPUS had been advised that the board had informed competitors of OPUS that the OPUS system did not meet the requirements for use in Ohio, and that such information was being used by these competitors to gain a competitive advantage over OPUS in Ohio's unit dose system market. The letter specifically demanded that the board immediately confirm in writing that it had not "disapproved" the OPUS unit dose system, and to affirmatively state that the OPUS system may "legally" be used in Ohio. The letter threatened litigation if the board did not immediately comply with this demand.

In an effort to clarify its position regarding the OPUS system, the board, through its Assistant Executive Director, William T. Winsley, R.Ph., M.S., responded to counsel by letter dated February 18, 1994. According to Winsley's letter, after the presentation on January 11, 1994, the OPUS representatives were requested by the board staff to forward samples of their product to the board before January 24, 1994, so that the board members could actually see OPUS's product and give an opinion as to its compliance with Ohio Adm.Code 4729–9–04. Furthermore, the representatives were informed that the board would not specifically approve or disapprove the OPUS product for use in Ohio, but would give only an opinion as to the product's compliance with Ohio

Adm.Code 4729–9–04 and that OPUS was to refrain from representing to customers that the OPUS product has been "board-approved." The letter also indicated that the board had learned that an OPUS representative had represented to potential customers that the OPUS system had been approved by the board.

The letter further indicated that the board. had not considered the OPUS system since OPUS had never submitted its product for review by the board. Winsley further explained that the board's staff had never stated that the OPUS system could not be marketed or used in Ohio and that the response to the board's licensed terminal distributor was only "part and parcel of a continuing conversation, between the parties privileged to the facsimile, which involved the limited question of re-use after return of the drugs." The letter reiterated that the board staff felt that the system did not comply with Ohio Adm.Code 4729–9–04 and concluded by suggesting that OPUS submit samples of its product for review by the full board.

On March 10, 1994, Mark G. Keffeler, Vice President of OPUS, and David Grauer, counsel for OPUS, met with the board to review the OPUS unit dose system. At this meeting, Winsley conducted a test of the OPUS product to determine if the system met the requirements of Ohio Adm.Code 4729–9–04. The test consisted of placing an Advil tablet in a sample OPUS unit dose container and resealing the container. After the container had been resealed, Winsley and various board members present at the meeting could not physically tell that the lid had been opened. Some of the board members were unable to detect the tampering even after being told what to look for. As a result, the board concluded that it was impossible for persons working with the OPUS system to verify whether the container remained unopened as required by the rule.

According to the board's official minutes of the March 10, 1994 meeting, the board voted to send a letter to OPUS "informing them that, pursuant to the provisions of the Ohio Administrative Code Rule 4729–9–04, drugs dispensed using their system may not be returned to the pharmacy and re-dispensed to other patients." On April 11, 1994, the board issued a letter over the signature of William Winsley, stating that "[t]he board determined that the OPUS system does not meet the requirements specified by OAC 4729–9–04. Therefore, drugs packaged in this system may not be returned to the issuing pharmacy for reuse."

On April 26, 1994, OPUS filed a complaint in the Franklin County Court of Common Pleas, requesting that the court (1) declare the board's April 11, 1994 letter and "determination" to be illegal and invalid because both were issued in excess of the board's statutory powers and violated OPUS's rights under the Commerce Clause; (2) declare the letter and "determination" to be unconstitu-

tional and a discriminatory abuse of the board's power in violation of OPUS's equal protection rights under Section 2, Article I of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution; (3) declare the letter and "determination" to be invalid in violation of Ohio's Administrative Procedure Act; (4) declare that the board has no power or authority to issue letters, opinions or determinations regarding the suitability for unit systems; and (5) issue a permanent injunction restraining the board from exceeding its powers and committing further violations of OPUS's constitutional rights.

The trial court denied OPUS's request for injunctive and declaratory relief, finding, among other things, that the board had acted within its statutorily authorized power to interpret the rules and regulations it has promulgated to determine that the term "unopened," as used in Ohio Adm.Code 4729–9–04, could mean that a pharmacist should be able to make a normal visual observation of a unit dose product to determine if the container had been opened and that such an interpretation did not amount to illegal rulemaking. The court further found that the board, as part of its powers and duties related to governing the practice of pharmacy and the distribution of pharmaceuticals in Ohio, may respond to requests from its licensed pharmacists/distributors or manufacturers of unit dose products or systems with its opinion as to whether a particular product meets the requirements of Ohio Adm.Code 4729–9–04. Finally, the court found that the board's determination did not violate the Commerce Clause or OPUS's equal protection rights.

Although set forth as four separate assignments of error, this court has identified OPUS's arguments on appeal as centering around three major issues: (1) whether the board had the statutory authority to render an opinion in response to a request from a licensed pharmacist or manufacturer as to whether a particular product meets the requirements of Ohio Adm.Code 4729–9–04 as part of its power to regulate the practice of pharmacy and the distribution of drugs; (2) whether the board's determination regarding the term "unopened," as that term is used in Ohio Adm.Code 4729–9–04, was merely an interpretation or amounted to illegal rulemaking in violation of R.C. Chapter 119; and (3) whether the board's determination violated OPUS's rights under the Commerce Clause and the Equal Protection Clause.

OPUS first argues that the board exceeded the limits of its statutory authority by rendering an opinion regarding whether the OPUS unit system met the requirements of Ohio Adm.Code 4729–9–04. The regulation at issue, Ohio Adm.Code 4729–9–04, entitled "Returned Drugs," provides:

"No drug or drug product, which has been sold at retail and has left the physical premises of the terminal distributor of dangerous drugs, shall be dispensed again except non-controlled drugs dispensed for inpatients pursuant to

paragraph (C) of rule 4729–17–01 and paragraph (C) of rule 4729–17–05 of the Administrative Code or non-controlled drugs dispensed and delivered for outpatients to a psychiatric outpatient facility licensed with the board of pharmacy and provided by a government entity that are packaged in unopened, single-dose or hermetic containers and whereby the drug has not been in the possession of the ultimate user. Drugs that have been dispensed or possessed, not in accordance with this rule, are considered to be adulterated."

The board has broad authority to regulate the practice of pharmacy and the distribution of pharmaceuticals, including the regulation of pharmacists, pharmacy interns, and wholesale and retail distributors of dangerous drugs. See R.C. 4729.01 through 4729.62. R.C. 4729.26 empowers the board to make such rules and regulations, subject to and in accordance with R.C. 119.01 through 119.13, pertaining to the practice of pharmacy as may be necessary to carry out the purposes and enforcement of R.C. 4729.01 through 4729.37. Further, R.C. 4729.66 authorizes the board to promulgate rules and regulations, subject to and in accordance with R.C. 119.01 through 119.13, pertaining to the sale, resale and other distribution of dangerous drugs as may be necessary to carry out the purposes and enforcement of R.C. 4729.51 through 4729.62.

Within the scope of this authority, the board has the power to promulgate Ohio Adm.Code 4729–9–04, which governs the return for resale and redispensing of prescription drugs and declares that drugs that have not been dispensed in accordance with the rule are considered to be adulterated. Indeed, OPUS does not claim that the board had no authority to promulgate Ohio Adm.Code 4729–9–04, or that the regulation itself is facially invalid.

The scope of the board's authority to regulate the practice of pharmacy and the distribution of dangerous drugs goes well beyond the mere act of promulgating the rule itself. The board is accorded such implied powers as are necessary to carry into effect its express powers and duties. In *State ex rel. Lakeland Anesthesia Group, Inc. v. Ohio State Med. Bd.* (1991), 74 Ohio App.3d 643, 600 N.E.2d 270, the Cuyahoga County Court of Appeals held that the authority of the Ohio State Medical Board to respond to inquiries from a private insurer was reasonably implied from its express statutory authority to regulate the practice of medicine. In that case, an employee of Community Mutual Insurance Company ("CMIC") wrote to the Medical Board requesting a construction of one of the Medical Board's rules which had a potential impact on an insurance claims dispute between CMIC and Lakeland Anesthesia Group, Inc. When the Medical Board responded by letter, a dissatisfied attorney representing Lakeland wrote to the Medical Board requesting that the Medical Board retract the letter. When the Medical Board refused and reaffirmed its original interpretation in a second letter to Lakeland, Lakeland sued the Medical Board and

sought to strike down the letter on the basis that such "opinion" letters exceed the scope of the Medical Board's express authority. In addressing Lakeland's contention, the court stated:

"In responding to the questions posed by CMIC concerning the subject of the use of general anesthetics by certified nurse anesthetists under the direction of podiatrists, we believe that the Medical Board's response in the form of two letters fell within the ambit of the Medical Board's statutory authority.

" * * *

"The Medical Board is accorded such implied powers as are necessary to carry into effect its express powers and duties. *State ex rel. Copeland v. State Medical Bd.* (1923), 107 Ohio St. 20, 24, 140 N.E. 660, 661; see *Waliga v. Bd. of Trustees of Kent State Univ.* (1986), 22 Ohio St.3d 55, 57, 22 OBR 74, 75, 488 N.E.2d 850, 852, citing *State ex rel. Corrigan v. Seminatore* (1981), 66 Ohio St.2d 459, 20 O.O.3d 388, 423 N.E.2d 105. We believe that the Medical Board's response to an inquiry from the CMIC in the form of two 'opinion' letters was proper and the authority to so respond was reasonably implied from its express statutory authority to regulate the practice of medicine." *Id.* at 647–648, 600 N.E.2d at 273–274.

█ As in *Lakeland,* the board's authority to respond to both the December 1993 inquiry from one of its licensees and to OPUS's February 14, 1994 letter was reasonably implied from its express statutory authority to regulate the practice of pharmacy and the distribution of drugs. As was noted in *Lakeland,* a power of a state agency may be fairly implied from an express power where it is reasonably related to the duties of the agency. *Waliga v. Bd. of Trustees of Kent State Univ.* (1986), 22 Ohio St.3d 55, 56, 22 OBR 74, 74–75, 488 N.E.2d 850, 851. The board has express statutory authority to regulate both the practice of pharmacy and the distribution of drugs in the state of Ohio.

It is the nature of the board to respond to inquiries which come before it regarding the practice of pharmacy and the distribution of drugs. According to Winsley's deposition testimony, the board responds to numerous inquiries on a daily basis regarding the board's opinion on policies, procedures, or systems relating to the practice of pharmacy and the distribution of drugs. The board staff's initial opinion regarding the OPUS system was given in response to an inquiry from a licensed terminal distributor requesting guidance as to whether unused medications dispensed in OPUS's unit dose system could be returned for credit and subsequently redispensed to other patients, under the terms of Ohio Adm.Code 4729-9-04. The board's response went no further than to inform the licensee that there were several problems with the OPUS system and that the system did not meet the requirements of Ohio Adm.Code 4729-9-04. We reject

OPUS's suggestion that the board should have been precluded from offering such opinion. Had the board declined to offer its opinion regarding the OPUS system, the licensee may have returned the unused medications, in violation of Ohio Adm.Code 4729–9–04, and would then have been subjected to the board's disciplinary procedures. It is well within the board's implied authority to offer this type of opinion and professional commentary in order to provide guidance to licensed practitioners who wish to comply with statutes and regulations promulgated by the board.

As the board clearly had the authority to respond to the initial inquiry from the licensed terminal distributor, so too did the board have the inherent authority to respond to OPUS's letter demanding that the board confirm in writing that it had not "disapproved" its product and that the product could be used "legally" in the state of Ohio. The only effect of the board's opinion regarding the OPUS system was to inform the licensee that unused medications returned in the OPUS system could not be redispensed to other patients. Indeed, the board's February 18, 1994 letter informed counsel for OPUS that its response to the licensee was only between the parties privy to the inquiry and involved only the limited question of reuse after return of unused drugs. The board's response did not state that the OPUS system could not be marketed in Ohio and was not an attempt to regulate the manufacture or sale of unit dose systems in the state of Ohio, as OPUS now contends. Accordingly, OPUS's first argument is not well taken.

By its second argument, OPUS contends that the trial court erred by deferring to the board's power to interpret the meaning of the term "unopened" as that term is used in Ohio Adm.Code 4729–9–04, where such interpretation is inconsistent with the express language of the rule. Specifically, OPUS argues that the board's interpretation of "unopened" requires a prior board determination that the OPUS' unit is "tamper-evident," thereby creating a totally new rule without complying with the rulemaking provisions of R.C. Chapter 119.

As was the case in *Lakeland, supra,* the board may advise those affected of the meaning that it attaches to one of its rules. However, in so doing, an administrative agency may not expand the scope of the rule without complying with the rulemaking provisions of R.C. Chapter 119. *Ohio Nurses Assn., Inc. v. Ohio State Bd. of Nursing Edn. & Nurse Registration* (1989), 44 Ohio St.3d 73, 540 N.E.2d 1354.

In the instant case, the board merely interpreted the term "unopened," as that term is used in Ohio Adm.Code 4729–9–04, to mean that someone making a visual inspection of the unit dose system must be able to tell if the system had previously been opened. This court must give due deference to an administrative

interpretation formulated by an agency that has accumulated substantial expertise in the particular subject area and to which the General Assembly has delegated the responsibility of implementing the legislative command. *State ex rel. McLean v. Indus. Comm.* (1986), 25 Ohio St.3d 90, 25 OBR 141, 495 N.E.2d 370. Furthermore, such deference is afforded to an administrative agency's interpretation of its own rules and regulations if such an interpretation is consistent with statutory law and the plain language of the rule itself. *Jones Metal Products Co. v. Walker* (1972), 29 Ohio St.2d 173, 181, 58 O.O.2d 393, 398, 281 N.E.2d 1, 8. We find the board's interpretation to be a reasonable construction of Ohio Adm.Code 4729–9–04. The purpose of the board, which is composed of persons with the necessary knowledge and expertise in pharmacy to make such determinations, is to facilitate the promotion of the safe practice of pharmacy and distribution of drugs. We fail to see, as OPUS contends, how the board's interpretation of "unopened" is inconsistent with that term as it is used in Ohio Adm.Code 4729–9–04.

OPUS argues that *Nurses, supra,* supports its claim that the board's determination expanded, rather than interpreted, Ohio Adm.Code 4729–9–04, and that consequently, the determination amounted to the promulgation of a new rule in violation of the rulemaking procedure set forth in R.C. Chapter 119. We disagree.

In *Nurses,* the Ohio State Board of Nursing, in a position paper, expanded the authority of licensed practical nurses ("LPNs") to administer intravenous fluids. The Supreme Court of Ohio held that because the position paper issued by the Nursing Board enlarged the scope of practice of LPNs and was intended to have a uniform application to all LPNs in the state of Ohio, the position paper should have been promulgated in accordance with the procedure set forth in R.C. Chapter 119.

In contrast, the board's determination in the instant case merely interpreted the language used in an existing rule, but did not establish a new rule, standard or regulation. OPUS argues that the board's determination somehow defines the rule in a manner inconsistent with the express language of the rule. As noted previously, the board is entitled to due deference from the court in its interpretation of the technical requirements of the pharmacy profession. We cannot say that the board's interpretation of the term "unopened" to mean that a pharmacist must be able to look at a container and see whether it had been opened is inconsistent with the express language of the rule.

Moreover, we cannot agree with OPUS's contention that the board now requires a "prior determination" that a product is "tamper-evident." None of the board's correspondence includes the "tamper-evident" language used by OPUS throughout its brief, nor does the correspondence indicate that the board

required OPUS to present its product to the board for a "prior determination." The board merely gave OPUS the opportunity to present its product before the board so that the board could more intelligently respond to the initial inquiry made by one of its licensees. Accordingly, OPUS's second argument is not well taken.

■ Part one of OPUS's third argument contends that since OPUS's two main competitors, which are Ohio-based corporations, have never been subjected to a similar determination by the board regarding their unit dose systems, the board's determination regarding the system manufactured and marketed by OPUS, a Nebraska-based corporation, amounts to a regulation of the use of unit dose systems in interstate commerce in violation of the Commerce Clause of the United States Constitution. Specifically, OPUS argues that the board's determination effectively barred it from marketing its system in the state of Ohio.

■ The Commerce Clause limits the power of a state to discriminate against interstate commerce. *Gen. Motors Corp. v. Tracy* (1995), 73 Ohio St.3d 29, 30, 652 N.E.2d 188, 189. This aspect of the Commerce Clause prohibits regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. *Id.* at 31, 652 N.E.2d at 189. "The commerce clause forbids discrimination, whether forthright or ingenious." *Best & Co. v. Maxwell* (1940), 311 U.S. 454, 455, 61 S.Ct. 334, 335, 85 L.Ed. 275, 277; *Dayton Power & Light Co. v. Lindley* (1979), 58 Ohio St.2d 465, 468, 12 O.O.3d 387, 389, 391 N.E.2d 716, 718.

The United States Supreme Court outlined the general rule regarding the validity of state regulations affecting interstate commerce in *Pike v. Bruce Church, Inc.* (1970), 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174:

" * * * Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. * * * If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. * * * " *Id.* at 142, 90 S.Ct. at 847, 25 L.Ed.2d at 178.

■ The threshold of the *Pike* test requires a state to "regulate" the economic activity in question. In the instant case, the board sought neither to regulate OPUS's activities nor to enforce any regulation against it. Indeed, the board is not applying a statute or a regulation to OPUS. The board's determination does not constitute an outright ban on OPUS's system in Ohio, nor does it preclude OPUS from doing business in Ohio. The board's February 18, 1994

letter to counsel for OPUS specifically stated that the "Board of Pharmacy would not approve or disapprove their product for use in Ohio" and "the Board's staff never stated that this system could not be used in Ohio." Furthermore, at his deposition, Winsley testified that the board does not engage in the regulation of manufacturers of unit dose systems.

Moreover, even if the board has somehow regulated OPUS through its determination and the issuance of the letter, it is clear that the board has not engaged in any discriminatory activity. The board's determination gives no direct competitive advantage to Ohio manufacturers of unit dose systems. There is no evidence that the board's determination was made solely for the purpose or effect of protecting or giving commercial advantage to the Ohio manufacturers of unit dose systems at the expense of those involving interstate commerce. OPUS not only failed to put forth any credible evidence that interstate commerce is or will be injured, but also failed to show that local protection or promotion was the sole purpose of the board's determination.

The board has not considered whether the unit dose systems manufactured by OPUS's competitors would meet the requirements of the rule pertaining to the return and redispensing of drugs for the simple reason that no one has requested that the board do so. At his deposition, Winsley testified that if the board were requested to review the products of OPUS's competitors, including those competitors based in Ohio, the board would review those products as it had OPUS's.

The mere fact that the determination may cause Ohio consumers of unit dose systems to choose an Ohio product over OPUS's product does not cause a discrimination against interstate commerce. In short, the board's determination does not impermissibly impose an oppressive burden on OPUS in order to enhance the vitality of Ohio-based manufacturers of unit dose systems. Accordingly, we find no violation of the Commerce Clause.

Nearly the same arguments apply to OPUS's equal protection claim. OPUS contends that, since the board evaluated OPUS's products, its failure to likewise evaluate OPUS's competitors' products results in a violation of the Equal Protection Clause.

For a state regulation or action to pass constitutional scrutiny under the Equal Protection Clause, the regulation or action must pass the rational basis test. Thus, when a regulation is challenged as being discriminatory, the court presumes the constitutionality of the statute and requires only that the classification challenged be rationally related to a legitimate state interest. Further, under the Equal Protection Clause, for a claimant to show that he was singled out for discriminatory treatment, the claimant must show that the enforcement has a discriminatory effect and a discriminatory purpose.

As previously noted, there is no evidence of any discriminatory effect or purpose in the board's treatment of OPUS. The board's determination was made as a response to the initial inquiry regarding OPUS's product and to OPUS's letter of February 14, 1994. The board has not been asked to evaluate the products of OPUS's competitors, but has indicated that it would do so should such a request be presented.

Further, OPUS must prove that similarly situated parties received better treatment than OPUS. There is no evidence that OPUS's competitors received better treatment before the board as there is no evidence that the board evaluated these competitors' products. Accordingly, we find OPUS's Commerce Clause and equal protection arguments to be without merit.

For the foregoing reasons, OPUS's assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

LAZARUS and STRAUSBAUGH, JJ., concur.

DEAN STRAUSBAUGH, J., retired, of the Tenth Appellate District, sitting by assignment.