[Cite as *State ex rel. Kent Elastomer Prods., Inc. v. Logue*, 2024-Ohio-5451.]

’IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Kent Elastomer Products, Inc., | : | |
| Relator, | : | |
| | | No. 21AP-387 |
| v. | : | |
| | | (REGULAR CALENDAR) |
| John Logue, Administrator, Ohio Bureau of Workers' Compensation, | : | |
| | : | |
| Respondent. | : | |

D E C I S I O N

Rendered on November 19, 2024

**On brief:** *ROETZEL & ANDRESS, LPA*, *Douglas E. Spiker*, and *Monica L. Frantz*, for relator.

**On brief:** *Dave Yost,* Attorney General, and *John Smart,* for respondent.

IN MANDAMUS
ON OBJECTIONS AND MOTION TO DISMISS

MENTEL, P.J.

{¶ 1} Relator, Kent Elastomer Products, Inc. ("relator"), filed this original action seeking a writ of mandamus ordering respondent, John Logue, Administrator, Ohio Bureau of Workers' Compensation ("respondent" or "the BWC"), to vacate the BWC's orders denying relator's request that the BWC apply Ohio Adm.Code 4123-17-73(Q). Relator claims that the BWC has a clear legal duty to "administer" the regulation, which sets forth a process for calculating and issuing refunds to employers who, as a group, have fewer injuries and loss than the initial premium calculation assumed. (Aug. 3, 2021 Compl. at 10.) The BWC counters that because relator received a one-time 100 percent refund in the form of a dividend from the fund's excess surplus that the agency awarded under R.C.

4123.321 and Ohio Adm.Code 4123-17-10 in the wake of the COVID-19 pandemic, it is not entitled to any additional refund. For the reasons set forth below, we overrule the BWC's first four objections, sustain its fifth objection, adopt the decision of the magistrate with one exception, and grant relator a limited writ in accordance with the magistrate's recommendation.

{¶ 2} Relator participates in the BWC's group retrospective rating program, which the agency is required to offer under R.C. 4123.29(A)(4). The group retrospective rating program is "a voluntary workers' compensation insurance program" that "is designed to provide financial incentive to employer groups participating in the program that, through improvements in workplace safety and injured worker outcomes, are able to keep their claim costs below a predefined level." Ohio Adm.Code 4123-17-73(A)(1). Participating employers join in "retro groups," subject to a number of eligibility requirements. *Id.* at 4123-17-73(C). Employers in each group must have "substantially similar" businesses with "substantially homogenous" risks, assessed by reference to their previous years' ratings and risk based on being part of "the same or similar industry groups." *Id.* at 4123-17-73(C)(2). The "aggregate standard premium" of each retro group must exceed one million dollars and each group must contain at least two employers. *Id.* at 4123-17-73(C)(3) and (C)(4). In addition, each employer must "document its safety plan or program" in order to fulfill the requirement that participation in the group retro program "substantially improve[s] accident prevention and claims." *Id.* at 4123-17-73(C)(5).

{¶ 3} The incentive for participating employers is the possibility of a refund of a portion of the premiums paid based on a periodic "group retrospective premium calculation." Ohio Adm.Code 4123-17-73(Q). At the time relevant to relator's claim, the provision stating the method for the refund calculation read as follows:

> The group retrospective premium calculation will occur at twelve, twenty-four, and thirty-six months following the end of the group retro policy year.
>
> (1) On the evaluation date, the bureau will evaluate all claims with injury dates that fall within the retro policy year. The incurred losses and reserves that have been established for these claims are "captured" or "frozen." The group's retrospective premium will be calculated based on the developed incurred losses of the group. The group retrospective premium will be compared to the group

standard premium (the combined standard premiums of retro group members for the retro policy year as defined in paragraph (A)(11) of this rule) and all subsequent group retro refunds/assessments. The difference will be distributed or billed to employers as a refund or assessment.

(a) These assessments will be limited per a maximum premium ratio selected during the group retro application process.

(b) Any reserving method that suppresses some portion of an employer's costs for the purpose of calculating an experience modification will not apply in the calculation of incurred losses for group retrospective rating.

(c) The bureau may hold a portion of refunds or defer assessments owed in the first and second evaluation periods to minimize the volatility of refunds and assessments. Any net refund or assessment will be fully distributed or billed by the bureau in the third evaluation period.

(2) Incurred losses used in the group retrospective premium calculation will be limited to five hundred thousand dollars per claim.

(3) Incurred losses will not include surplus or VSSR costs.

Ohio Adm.Code 4123-17-73(Q) (effective July 1, 2019).[1]

{¶ 4} The BWC accepted relator into the group retrospective rating program on March 28, 2018 "for the policy year beginning on July 01, 2018." (Stipulated Record (hereinafter "S.R.") at 3.)

{¶ 5} On April 10, 2020, in an effort to "ease the financial pressures" employers faced in the wake of the COVID-19 pandemic, the BWC announced "a one-time 100 percent dividend" payable to employers who had contributed to the workers' compensation fund amounting to a refund of the premiums paid for the 2018 fiscal year. (S.R. at 7.) The dividend was paid pursuant to the BWC's authority under R.C. 4123.321 and Ohio Adm.Code 4123-17-10 to issue a refund of premiums in the event of the fund's surplus. *Id.* R.C. 4123.321 states that when there is "a surplus of earned premium over all losses that * * * is larger than is necessary adequately to safeguard the solvency of the fund, [the BWC]

---

[1] Unless specified, all references to Ohio Adm.Code 4123-17-73 are to the version effective July 1, 2019, the version in effect at the time relator made its request.

may return such excess surplus to the subscribers to the fund in either the form of cash refunds or a reduction of premiums, regardless of when the premium obligations have accrued." The board of directors of the BWC:

> has full discretion and authority to determine whether there is an excess surplus of premium; whether to return the excess surplus to employers; the nature of the cash refunds or reduction of premiums; the employers who are subscribers to the state insurance fund who are eligible for the cash refunds or reduction of premiums; the payroll period or periods for which a reduction of premium has accrued and the premium payment for which the reduction of premium applies; the applicable date of the cash refunds or reduction of premiums; and any other issues involving cash refunds or reduction of premiums due to an excess surplus of earned premium.

Ohio Adm.Code 4123-17-10.

{¶ 6} The BWC's board of directors determined that the following eligibility and calculation criteria applied to private employers of the April 10, 2020 dividend:

> The private employer dividend will be defined as 100 percent of billed premium for the eligible employers for the applicable policy period of July 1, 2018 through June 30, 2019. The percentage will be applied to the blended premium amount. Other clarifications of the appropriate premium base include:
>
> * * *
>
> 2) Premium base for private, group retrospective rated employers will be defined as individual, experience rated premium as of April 4, 2020. Future evaluations including the 2018 public and private group retrospective rated policy years will not result in adjustment of the dividend or any additional credits or debits.

(S.R. at 8.)

{¶ 7} In early May of 2020, a representative for relator's retro group corresponded with representatives of the BWC, asking whether, in addition to the one-time 100 percent dividend, the refund based on the group retrospective premium calculation under Ohio Adm.Code 4123-17-73 would be issued as well. (S.R. 15-16.) After a series of exchanges, relator submitted a request for a refund under that regulation, which the BWC denied on September 10, 2020. (S.R. at 30.) Relator filed a Statement of Protest and requested a hearing on the issue before the BWC's Adjudicating Committee on October 15, 2020. *Id.* at

32.  The hearing was held on October 22, 2020, and the Adjudicating Committee issued its order denying relator's request on December 8, 2020.  *Id.* at 35.  Relator subsequently appealed to the Administrator's Designee.  *Id.* at 49.

{¶ 8}  In an order dated June 10, 2021, the Administrator's Designee denied the appeal.  *Id.* at 51.  The order discussed the BWC's discretionary authority under R.C. 4123.321 to refund premiums arising from the fund's surplus, the group retrospective rating program under Ohio Adm.Code 4123-17-73, and the circumstances surrounding the 100 percent dividend announced on April 10, 2020.  The order rejected relator's assertion that it had been "financially harmed" by the decision to issue the 100 percent premium refund in the form of a surplus dividend rather than the calculated premium refund under Ohio Adm.Code 4123-17-73:

> For context, the employer received a dividend in the amount of $155,069, and the employer believed it should have received an additional $40,000 had BWC issued it a premium refund under the group retrospective rule following the first evaluation period. The Administrators' Designee rejects counsel's argument that the employers receipt of 100% premium dividend, issued by BWC during a global pandemic and unprecedent[ed] economic shutdown, was unfair. Again, the highest discount the employer could have hoped to achieve under the group's retrospective rating program, alone, was 68%. The current societal circumstances were unthinkable when the employer requested to participate in the group retrospective rating program in early 2018. BWC and the Board moved swiftly to address the vast and pervasive effects of the COVID-19 pandemic on employers, and just one of those measures involved issuing substantial premium dividends. Despite that, the employer's counsel argues the employer would have been better off had it selected a different rating program, with the implication being that it would have made different business decisions had it known BWC would have offered a premium dividend equaling 100% of 2018 premiums paid. Not only does this ignore that BWC offered a number of dividends in prior policy years, and, consequently, it was foreseeable BWC would offer future dividends, it ignores the benefit of what the employer actually enjoyed as a result of BWC's actions: the employer does not face the possibility of owing additional premium following the three evaluations., and it received every penny back it paid in premium during the 2018 policy year.

(Footnote omitted.)  *Id.* at 52.

{¶ 9}    The BWC emphasized that it had "considered the group retrospective rule in crafting the dividend calculation, and the BWC continues to perform the required group retrospective premium evaluations at the scheduled intervals." *Id*. at 53.  The BWC had "granted all employers a dividend amounting to 100% of the premiums employers paid in the 2018 policy year, subject to the clarifying language that defined 'the appropriate premium base' for each employer type." *Id.*  The order noted that relator did not "challenge the BWC's authority to define the appropriate premium base relative to each type of rating program participant, i.e. the premium base differed as between experience rated employers, deductible program employers, individual retrospective rated employers, and group retrospective rated employers." *Id*. at 54.

{¶ 10} The order also rejected relator's assertion that an amendment to Ohio Adm.Code 4123-17-73(Q)(1)(b) enacted after the dividend that "prohibit[ed] premium refunds or rebates from exceeding 100% of actual premiums paid" was "evidence [that] BWC lacked authority to act in absence of the rule's amended language." *Id*.  According to the BWC, the agency "often journalizes its past practice in the administrative rules, and BWC does so to provide clear guidance on a subject." *Id*.  Finally, the order rejected relator's argument that it had "suffered financial harm with respect to any anticipated future refunds it could have received" as "speculative" because, at "future evaluations" under the rule, relator might well have been subject to an assessment rather than any refund.  *Id*.

{¶ 11} Relator filed this original action in mandamus on August 3, 2021.  The complaint alleged that the BWC had abused its discretion "when it wholly disregarded the requirements of O.A.C. 4123-17-73, refused to issue payment of refunds to Kent Elastomer, and effectively nullified the Program for the 2018 Policy Year without any authority to do so." (Compl. at ¶ 27.)  Relator argued that it had "a clear legal right to the refunds owed to it" for every evaluation period stated in the regulation, that the BWC had "a clear legal duty to administer" the group retrospective rating program because the agency "must follow its [own] rules as written." *Id*. at ¶ 28-30.  Relator asserted that it had exhausted all possible administrative remedies and had "no adequate remedy at law," and therefore was entitled to relief in mandamus.  *Id*. at ¶ 31.

{¶ 12}  Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate.  The magistrate recommends that we grant a

limited writ ordering "the BWC to administer the program as required by former Ohio Adm.Code 4123-17-73(Q), and to distribute a refund or charge an assessment consistent with the requirements" of that regulation. (Mag.'s Decision at ¶ 69.) The magistrate agrees with relator, stating that "the BWC acted without authority to alter the rules governing the program for the 2018 year and not distribute any refunds or charge any assessments under the program as required by former Ohio Adm.Code 4123-17-73." *Id.* at ¶ 61. In the magistrate's reading, the language of that regulation was "mandatory," and the BWC "failed" to "follow its rules as written and the plain language employed therein." *Id.* In addition, the magistrate concludes that by issuing the dividend, the BWC "attempted to modify [its] obligations imposed by former Ohio Adm.Code 4123-17-73(Q)(1)" without engaging in the rulemaking process required by Chapter 119 of the Ohio Revised Code. *Id.* at ¶ 62. The magistrate rejects the BWC's argument that it had "the authority to make practical business decisions in extraordinary situations" because the agency failed to cite "any authority" in support. *Id.* at ¶ 64. The magistrate also finds that the BWC's assertion that relator did not suffer any financial harm is not "a pass to escape the mandatory provisions of former Ohio Adm.Code 4123-17-73(Q)(1) and the rulemaking requirements of R.C. 119." *Id.* at ¶ 66.

{¶ 13} On March 6, 2023, the BWC filed five objections to the magistrate's decision:

[1.] The BWC objects to the magistrate's legal conclusion that the BWC failed to administer the 2018 group retro program pursuant to Ohio Adm.Code 4123-17-73.

[2.] The BWC acted within its unchallenged statutory and regulatory authority and discretion under R.C. 4123.321 and Ohio Adm.Code 4123-17-10 to determine how to issue a dividend to several employer programs, each of which is created and governed by its own specific rule.

[3.] The BWC has no clear legal duty under the group retro rule to post a transaction to Kent Elastomer's account that generates a refund of more money than it paid in premiums in 2018.

[4.] The magistrate's focus on the group retro rule ignores the broad discretion of the Board in establishing the dividend criteria, and renders mandamus an inappropriate remedy.

[5.] The magistrate erred in concluding the BWC was obligated to amend the group retro rule under Chapter 119.

**A. First and Second Objections**

{¶ 14} The BWC first objects to the magistrate's conclusion that it did not administer the group retro program in accordance with its governing regulation, Ohio Adm.Code 4123-17-73. The BWC argues that "the plain language of the rule" describing the premium calculation supports the agency's "adherence to the Board's instruction [in the April 10, 2020 dividend] that '[f]uture evaluations including the 2018 public and private group retrospective rated policy years will not result in adjustment of the dividend or any additional credits or debits.'" (Objs. at 5-6, quoting S.R. at 8.) The dividend qualified under the rule's description of a "subsequent group retro refund[]/assessment[]," the BWC argues. *Id.* at 6, quoting Ohio Adm.Code 4123-17-73(Q)(1). Thus, issuing the dividend "netted out" any future refund based on the calculation described in the regulation. *Id.* at 7. In the BWC's reading, a "refund" under Ohio Adm.Code 4123-17-73(Q)(1) encompasses "any type of refund" it decides to issue, including one issued as an excess surplus dividend under R.C. 4123.231 and Ohio Adm.Code 4123-17-10. *Id.* at 7. In the second objection, the BWC argues that it "acted within its unchallenged statutory and regulatory authority and discretion under R.C. 4123.321 and Ohio Adm.Code 4123-17-10" when issuing the April 10, 2020 dividend, and that the magistrate erred by finding that it had "modified the administrative code that regulated the group retro program." *Id.* at 14, 16.

{¶ 15} In response, relator argues that the BWC "interchangeably" uses the terms refund and dividend and "confuses the difference between" them to argue that a dividend of excess surplus issued under R.C. 4123.231 and Ohio Adm.Code 4123-17-10 may substitute for the premium calculation required under Ohio Adm.Code 4123-17-73. (Mar. 31, 2023 Relator's Memo in Opp. to Respondent's Objs. to the Mag.'s Decision (hereinafter "Memo in Opp.") at 2-3.) Relator asserts that the rules operate independently of one another, their terms "do not intersect," and the BWC's "responsibility" to administer the premium calculation under Ohio Adm.Code 4123-17-73(Q)(1) "was not impacted" by the April 10, 2020 dividend. *Id.* at 4. Relator also emphasizes that Ohio Adm.Code 4123-17-73(A)(11), which defines "standard premium," specifically prohibits relying on "any rebates or dividends issued pursuant to Rule 4123-17-10 of the Administrative Code" when reducing premiums under the group retro program. *Id.* at 5.

{¶ 16} As the magistrate noted, no party disputes the BWC's authority to refund "excess surplus" to employers "either the form of cash refunds or a reduction of premiums" under R.C. 4123.321 in the event of a surplus, as long as the statute's directive to "safeguard the solvency of the fund" is followed. As the implementing regulation elaborates, the BWC's board of directors "has full discretion and authority to determine whether there is an excess surplus of premium," to decide "whether to return the excess surplus to employers; the nature of the cash refunds or reduction of premiums," and which employers are eligible for such a refund, among other discretionary acts involving such refunds. Ohio Adm.Code 4123-17-10. The BWC exercised this authority on April 10, 2020, when it announced that relator's surplus refund would "be defined as 100 percent of billed premium for the eligible employers for the applicable policy period of July 1, 2018 through June 30, 2019." (S.R. at 8.) Applying this definition, relator's dividend amount was $155,069. *Id.* at 30.

{¶ 17} The dispute in this case arises from the effect of the other language in the April 10, 2020 announcement, as applied to relator:

> The percentage will be applied to the blended premium amount. Other clarifications of the appropriate premium base include: * * * Premium base for private, group retrospective rated employers will be defined as individual, experience rated premium as of April 4, 2020. Future evaluations including the 2018 public and private group retrospective rated policy years will not result in adjustment of the dividend or any additional credits or debits.

*Id.* at 9.

{¶ 18} The foregoing language specifically addressed and purported to modify the administration of the group retrospective rating program. Ohio Adm.Code 4123-17-73(Q)(1) states that on an evaluation date, a "group's retrospective premium will be calculated based on the developed incurred losses of the group," which will then "be compared to the group standard premium * * * and all subsequent group retro refunds/assessments," resulting in a "difference" that "will be distributed or billed to employers as a refund or assessment." But the April 10, 2020 announcement states that such "evaluations * * * will not result in adjustment of the dividend or any additional credits or debits." (S.R. at 8.) In effect, this statement signaled the BWC's intention to not perform any refund or assessment under Ohio Adm.Code 4123-17-73(Q) for the policy year,

regardless of whether the evaluation of actual losses would have otherwise resulted in a retrospective adjustment to the premium. Thus, the question presented is whether the BWC's authority to refund "excess surplus" to employers under R.C. 4123.321 and Ohio Adm.Code 4123-17-10 allowed it to modify its administration of the group retrospective rating program under Ohio Adm.Code 4123-17-73.

{¶ 19} "Like all statutorily created agencies, the BWC can exercise only those powers conferred upon it by the General Assembly." *State ex rel. V&A Risk Servs. v. State Bur. of Workers' Comp.*, 10th Dist. No. 11AP-742, 2012-Ohio-3583, ¶ 30, citing *State ex rel. Cincinnati v. Ohio Civ. Rights Comm.*, 2 Ohio App.3d 287, 288 (10th Dist.1981). Under R.C. 4123.321, the General Assembly granted the BWC the discretion to return "excess surplus" to employers, but the statute does not grant the BWC any accompanying power to alter the administration of the group retrospective rating program. Although R.C. 4123.321 also instructs the BWC to "adopt a rule" implementing the "return [of] excess surplus," the rule in question does not describe any discretion to alter or withhold administration of the group retrospective rating program. *See* Ohio Adm.Code 4123-17-10 (stating that the BWC's board has "full discretion and authority to determine" the existence of "an excess surplus of premium" and "whether to return the excess surplus to employers," among other powers involved in refund of surplus). The rule contains a type of catch-all provision that allows the BWC to determine "any other issues involving cash refunds or reduction of premiums due to an excess surplus of earned premium," but this language does not give the BWC the discretion to not calculate a premium adjustment under another regulation or act on a matter that is not due to an excess surplus of earned premium. *Id.*

{¶ 20} "[The] BWC and the commission must follow their own rules as written." *State ex rel. H.C.F., Inc. v. Ohio Bur. of Workers' Comp.*, 80 Ohio St.3d 642, 647 (1998). Here, however, the BWC points to no language in R.C. 4123.321 or Ohio Adm.Code 4123-17-10, the statute and regulation governing the fund's excess surplus, that gave it the discretion to not apply the rule administering the group retrospective rating program. By the BWC's own description announcing the April 10, 2020 dividend, it acted "[p]ursuant" only to its authority under R.C. 4123.321 and Ohio Adm.Code 4123-17-10.

{¶ 21} The BWC reads "the plain language" of Ohio Adm.Code 4123-17-73 describing the premium calculation to include an excess surplus returned under Ohio

Adm.Code 4123-17-10. (Objs. at 5.) The regulatory language cited by the BWC states: "The group retrospective premium will be compared to the group standard premium (the combined standard premiums of retro group members for the retro policy year as defined in paragraph (A)(11) of this rule) and all subsequent group retro refunds/assessments." Ohio Adm.Code 4123-17-73(Q)(1). But neither the "standard premium" nor "subsequent group retro refund/assessments" plainly refer to excess surplus under Ohio Adm.Code 4123-17-10. As the magistrate noted, the definition of "standard premium" specifically prohibits inclusion of any excess surplus: "In determining standard premium, total premium paid will not be reduced by any rebates or dividends issued pursuant to rule 4123-17-10 of the Administrative Code." Ohio Adm.Code 4123-17-73(A)(11).

{¶ 22} The phrase that the BWC argues may include an excess surplus refund, "subsequent group retro refunds/assessments," is stated in Ohio Adm.Code 4123-17-73(Q)(1). But its meaning depends on context. *See*, *e.g.*, *Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, ¶ 9, quoting *Black-Clawson Co. v. Evatt*, 139 Ohio St. 100, 104 (1941) (stating that in statutory interpretation, a court must "remain careful, however, not to 'pick out one sentence and disassociate it from the context' "). Ohio Adm.Code 4123-17-73(Q) first states that "[t]he group retrospective premium calculation will occur at twelve, twenty-four, and thirty-six months following the end of the group retro policy year," and the phrase "subsequent group retro refunds/assessments" is embedded in a subordinate provision describing how to perform the calculation. *See* Ohio Adm.Code 4123-17-73(Q) and 4123-17-73(Q)(1). Given this framing, "subsequent group retro refunds/assessments" refers to refunds resulting from the periodic calculations the rule describes. In addition, Ohio Adm.Code 4123-17-73(Q)(1) refers to the refunds or assessments as "group retro" ones, an adjectival phrase categorically limited to only refunds or assessments made under the group retro rule. It would diminish the coherency of Ohio Adm.Code 4123-17-73(Q) to accept that "group retro refunds/assessments" also includes any excess surplus refund issued pursuant to Ohio Adm.Code 4123-17-10, a separate regulation that applies to a much broader category of employers. *See* Ohio Adm.Code 4123-17-10 (granting BWC's board of directors "full discretion and authority to determine * * * the employers who are subscribers to the state insurance fund who are eligible for the cash refunds or reduction of premiums"). (*See also* S.R. at 7 (authorizing return of excess premium to "all private and public employer

taxing district State Insurance Fund employers") and 8 (defining dividend for both "private, individual retrospective rated employers" as well as "private, group retrospective rated employers").

{¶ 23} The BWC asserts that "[t]he word 'refund' in Ohio Adm.Code 4123-17-73(Q)(1)" may include "any type of refund the BWC issues to an eligible employer," including "go green rebates under Ohio Adm.Code 4123-17-14.3; lapse free rebates under Ohio Adm.Code 4123-17-14.4; and safety counsel rebates under Ohio Adm.Code 4123-17-56.2." (Objs. at 7.) The agency claims broad authority to define any such rebate as a refund under Ohio Adm.Code 4123-17-73(Q)(1), "regardless of what form that refund takes." *Id.* at 11. The BWC may, as a matter of internal practice, include any rebate it issues within the category of "subsequent group retro refunds/assessments" under Ohio Adm.Code 4123-17-73(Q)(1). However, it cites no authority that gives it the discretion to equate any rebate it issues, or any excess surplus returned under Ohio Adm.Code 4123-17-10, with the "subsequent group retro refunds/assessments" administered under Ohio Adm.Code 4123-17-73(Q)(1).[2]

{¶ 24} Where Ohio Adm.Code 4123-17-73 uses only the word "refund," context again shows that the regulation also refers only to a refund resulting from the group retrospective premium calculation. For example, Ohio Adm.Code 4123-17-73(R) details the mathematical calculation of the group retrospective premium. Subsection (5) states:

> Refunds and assessments will be distributed directly to group retro employers. The amount refunded or assessed to an individual employer will be based upon the percentage of the total group standard premium paid by the employer at the time of evaluation. The refund or assessment will be multiplied by this percentage and the resulting amount will be distributed or billed to the employer.

---

[2] The agency cites only Ohio Adm.Code 4123-17-16(D)(1)(a), claiming that this provision allows it to "remove any rebate" and "invoice the employer for the premium owed" if an employer fails to meet a rebate's eligibility requirements. *Id.* at 8. But Ohio Adm.Code 4123-17-16(D)(1)(a) only provides penalties for "failure to file or pay amounts due under the annual payroll report," one of which is the employer's removal from "discount programs for [following] the policy year." The regulation is otherwise silent on the subject of noncompliance with a rebate program's requirements. Neither Ohio Adm.Code 4123-17-16(D), the penalty provision, nor Ohio Adm.Code 4123-17-14, which governs payroll reports, mentions any rebate program or repercussions for an employer's noncompliance. Again, the agency's argument about how it actually applies the regulation admits more than it persuades.

{¶ 25} A refund that is "based upon the percentage of the total group standard premium" an employer pays "at the time of evaluation" cannot plausibly include *any* refund issued by *any* BWC program, as the agency asserts. *Id.* By its own terms, the amount depends solely on inputs to the group retrospective premium calculation under Ohio Adm.Code 4123-17-73. "Within four months of the evaluation date, if entitled, the bureau will send premium refunds." Ohio Adm.Code 4123-17-73(R)(6). The only entitlement to a refund described in this regulation arises from the group retrospective premium calculation.

{¶ 26} The BWC claims that the April 10, 2020 announcement of the excess surplus dividend "explicitly addressed the mechanics of the group retro program" because the agency "knew the impact a 100 percent premium dividend would have on group retro premium when calculations were completed." (Objs. at 11.) For this reason, the BWC "defined the dividend premium base for group retro employers as 'individual, experience rated premium,' " and declared that it would not perform future refunds under Ohio Adm.Code 4123-17-73(Q)(1) for the 2018 policy year. *Id.*

{¶ 27} However, the BWC has "no authority to rescind, by resolution, the operation of" an existing regulation, or to "retroactively apply" the regulation after a subsequent amendment. *State ex rel. Reider's, Inc. v. Indus. Comm. of Ohio*, 48 Ohio App.3d 242, 244 (10th Dist.1988). In that case, the relators applied to transfer as state fund employers to self-insured status under an existing regulation. *Id.* at 243. They applied after the BWC had "adopted a resolution which declared a 'temporary moratorium' on all applications for self-insurance" in order to conduct an actuarial study. *Id.* Before the effective date of the amended regulation, the BWC issued another resolution stating that any pending applications "would be processed in accordance with the amendments" to the regulation. *Id.* We held that the "resolution declaring a 'temporary moratorium' was but a thinly veiled attempt to rescind a preexisting rule" promulgated under Chapter 119 of the Ohio Revised Code. *Id.* at 245. Accordingly, relators' request to issue a writ directing the BWC to process their applications under the first version of the regulation was granted. *Id.*

{¶ 28} Here, the BWC similarly attempted to impose, by pronouncement, a temporary moratorium on group retro premium calculations under Ohio Adm.Code 4123-17-73(Q). Although the BWC has vigorously argued that it had the authority to temporarily

suspend its obligation to administer the group retro premium calculations, its arguments all ultimately rely on nothing but its own say-so as the authority to "rescind a preexisting rule." *Reider's* at 245. The first and second objections are overruled.

### B. Third and Fourth Objections

**{¶ 29}** In the third objection, the BWC argues that it has "no clear legal duty" under Ohio Adm.Code 4123-17-73 "to post a transaction to [relator's] account that generates a refund of more money than it paid in premiums in 2018." (Objs. at 18.) As a result of the April 10, 2020 dividend, relator "effectively paid no premium in the 2018 policy year, so no additional refunds were owed" under the group retro premium calculation, the BWC argues. *Id.* "Under the group retro rule, given that the BWC issued the dividend amounting to 100% of billed premium, the BWC could not post a transaction to [relator's] account following the group retro evaluation periods that would result in a premium refund where, in effect, no premium was paid." *Id.* at 19. The magistrate erred, the BWC argues, by "simply reading Adm.Code 4123-17-73(Q)(1)" to "guarantee[] a premium refund when no refund is owed." *Id.* at 21. In the fourth objection, the BWC argues that the magistrate's decision "ignores the broad discretion" it enjoys when "establishing the dividend criteria" under Ohio Adm.Code 4123-17-10. *Id.* at 21.

**{¶ 30}** Relator responds by arguing that the "premise" of the BWC's objection is that relator "is not permitted to receive a refund in excess of 100% of billed premiums" under Ohio Adm.Code 4123-17-73. (Memo in Opp. at 9.) The version of the regulation in effect at the time of the April 10, 2020 dividend made no "exception or limitation" for applying it even in the event of a 100 percent premium refund, relator argues, and the BWC's objections "fail to refute the plain language" that the magistrate considered mandatory. *Id.* at 10.

**{¶ 31}** The BWC's objection misstates the clear legal duty in question, which is to administer the group retro premium calculation under Ohio Adm.Code 4123-17-73 as stated in the regulation. If that act requires the BWC to "post a transaction" that exceeds the amount of the premium relator paid in 2018, that is an effect of performing the clear legal duty the regulation describes, not the duty itself. (Objs. at 19.)

**{¶ 32}** The BWC also muddies the distinction between a return of excess surplus under Ohio Adm.Code 4123-17-10 and a refund resulting from the group retro premium

calculation under Ohio Adm.Code 4123-17-73(Q). The BWC chose to define the amount of excess surplus returned to employers "as 100 percent of billed premium" for the policy period when announcing the April 10, 2020 dividend. Under Ohio Adm.Code 4123-17-10, it had "full discretion and authority" to base the amount of the dividend on whatever reference point it chose, including the amount of premium. As explained previously, the discretion the BWC enjoys when determining the amount and "nature" of excess surplus returned under Ohio Adm.Code 4123-17-10 did not allow it to modify the group retro premium calculation under Ohio Adm.Code 4123-17-73(Q).

{¶ 33} Many of the BWC's arguments are understandably motivated by the appearance of creating a windfall for relator. It claims that performing the group retro premium calculation "would force the BWC to generate an account credit that would refund more than 100% of its premium for policy year 2018." (Objs. at 20.) The BWC also argues that because it is "the fiduciary of the state insurance fund," it has "the duty to ensure that more that 100% of premiums was not refunded in policy year 2018." *Id*. at 24. We sympathize with what the BWC perceives to be an unwelcome outcome, and note that it has prevented any similar future outcome with the amendment to Ohio Adm.Code 4123-17-73(Q)(1)(b) discussed by the magistrate. However, an unintended consequence cannot substitute for the legal authority an agency must possess to act, or, in the case of the group retro premium calculation under Ohio Adm.Code 4123-17-73(Q), to not act.[3] Furthermore,

---

[3] Offering a "common" definition of the word "refund" (with no cited source), the dissent asserts that "a return of money for overpayment" of premium results from any refund issued under the group retro rule, Ohio Adm.Code 4123-17-73(Q), or the excess surplus return authorized by R.C. 4123.321 and Ohio Adm.Code 4123-17-10. (Dissent at ¶ 39.) But the general observation that "both circumstances involve the return of funds to an employer, namely premium payments" does not account for the distinct mechanisms under those regulations that result in the refunds. *Id*. As discussed in Section A above, in the context of Ohio Adm.Code 4123-17-73(Q), all "refunds" are either expressly described as "group retro refunds/assessments" or "refer only to a refund resulting from the group retrospective premium calculation." *Supra* at ¶ 24. This use of the term is not equivalent to the description of excess surplus, which may take "the form of cash refunds or a reduction of premium" under R.C. 4123.321.

The dissent's main argument is that because "100 percent of the premium paid for fiscal year 2018 had been refunded, there was no premium payment remaining for the BWC to refund." (Dissent at ¶ 39.) Thus, any group retro calculation under Ohio Adm.Code 4123-17-73(Q) would be fruitless: "there is no premium payment that could be returned to relator as a refund." (Dissent at ¶ 39.) This assertion is not consonant with the Supreme Court's description of the fund. *See Cleveland v. Ohio Bureau of Workers' Comp.*, 159 Ohio St.3d 459, 2020-Ohio-337, ¶ 4 ("The BWC deposits these premiums into a single state insurance fund (it does not maintain a separate account for each employer), and it pays compensation benefits associated with work-related accidents from that fund."). In substance, the dissent poses the same argument as the

while the premium calculation may result in relator receiving an amount greater than the premium it paid, the excess surplus dividend was "possible due to [the BWC's] investment returns, prudent fiscal management, and the good work of employers who pay their BWC premiums and look out for the health and safety of their employees." (S.R. at 7.) "Any excess cash flowing in [after claims and costs] is invested for the benefit of the State Fund," so any dividend issued under Ohio Adm.Code 4123-17-10 results from returns made possible by investing premium contributions, including those of relator. *CPC Parts Delivery, LLC v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 22AP-671, 2024-Ohio-18, ¶ 5. Finally, we note that in 2014, 2015, 2016, and 2017, relator did in fact receive refunds totaling more than the premium it paid for each of those years. (S.R. at 48 (listing relator's final net premiums from 20112017, with negative net premiums after group retro refund and other refunds ranging from $-181 to $-29,248.) The third and fourth objections are overruled.

### C. Fifth Objection

**{¶ 34}** In the final objection, the BWC argues that the magistrate erroneously concluded that it "was obligated to amend the group retro rule under Chapter 119" because the group retro rule, Ohio Adm.Code 4123-17-73, was promulgated under R.C. 111.15. (Objs. at 28.)

**{¶ 35}** The BWC is correct that Ohio Adm.Code 4123-17-73 was promulgated under R.C. 111.15, not R.C. 119.01. *See* Ohio Adm.Code 4123-17-73. R.C. 4123.29(A)(4) is the statutory authorization for the BWC's group retrospective rating program. The administrative rulemaking procedures under "Sections 119.01 to 119.13 of the Revised Code do not apply to actions of * * * [the] bureau of workers' compensation under * * * sections 4123.29 * * * with respect to all matters concerning the establishment of premium, contribution, and assessment rates." R.C. 119.01(A)(1). However, both R.C. 111.15 and R.C. 119.01 set forth rulemaking procedures for agencies to follow when promulgating

---

BWC's third objection. However, neither cites to any statute, regulation, or case law that gives the BWC discretion to suspend the administration of a regulation that it otherwise has a clear legal duty to administer. The dissent considers the outcome "simply untenable," a characterization with which we do not wholly disagree. (Dissent at ¶ 39.) "However, the confines of statutory construction do not afford the judicial branch latitude to consider policy matters or outcome metrics in determining the meaning of a statute" or a regulation. *State v. Gonzales*, 150 Ohio St.3d 276, 2017-Ohio-777, ¶ 68. *See also State ex rel. Brilliant Electric Sign Co. v. Indus. Comm. of Ohio*, 57 Ohio St.2d 51, 54 (1979) (holding that a "maxim" of statutory interpretation "applies equally to administrative regulations").

regulations, regardless of which statute applies. "R.C. Chapter 119, the Ohio Administrative Procedure Act, applies to most state administrative agencies, and R.C. 111.15 specifies the rulemaking procedure for most agencies not covered by R.C. Chapter 119." *State ex rel. Ryan v. State Teachers Retirement Sys.*, 71 Ohio St.3d 362, 366 (1994). The magistrate's concern was the BWC's failure to follow any administrative rulemaking procedure when it decided to temporarily suspend its obligation to apply Ohio Adm.Code 4123-17-73(Q), not the particular statute governing the rulemaking. The error does not otherwise affect the magistrate's decision, which we will adopt with the foregoing correction. The fifth assignment of error is sustained.

{¶ 36} Having reviewed the magistrate's decision, made an independent review of the record, and having considered the BWC's objections, we adopt the magistrate's findings of facts and conclusions of law, with the one exception regarding the promulgation of Ohio Adm.Code 4123-17-73 under R.C. 111.15. We overrule the BWC's first, second, third and fourth objections, sustain the fifth, and grant relator the limited writ of mandamus recommended by the magistrate.

*Objections sustained in part and overruled in part*;
*limited writ of mandamus granted.*

EDELSTEIN, J., concurs.
LUPER SCHUSTER, J., dissents.

LUPER SCHUSTER, J., dissenting.

{¶ 37} Because I would sustain the BWC's third objection to the magistrate's decision and deny the requested writ of mandamus, I dissent.

{¶ 38} In April 2020, and pursuant to R.C. 4123.321 and Ohio Adm.Code 4123-17-10, the BWC issued a one-time 100 percent premium refund payable to employers, including relator, who had contributed to the workers' compensation fund for the 2018 policy year. Relator, a participant in the BWC's group retrospective rating program, requested an additional refund pursuant to Ohio Adm.Code 4123-17-73(Q) for the 2018 fiscal year. The BWC denied this request, and relator seeks a writ ordering the BWC to issue payment of any refund owed under Ohio Adm.Code 4123-17-73(Q). The magistrate recommends the granting of the writ, and the majority agrees. In my view, however, relator is not entitled to the requested writ.

{¶ 39} Relator's contention that the BWC was required to issue an additional refund to it pursuant to Ohio Adm.Code 4123-17-73(Q) for fiscal year 2018, even though the BWC already issued a full, 100 percent premium refund for that year, is simply untenable. I agree with relator, and the majority, that a "refund" under Ohio Adm.Code 4123-17-73(Q) does not include the BWC's return of premium pursuant to the BWC's authority under R.C. 4123.321 and Ohio Adm.Code 4123-17-10. However, both circumstances involve the return of funds to an employer, namely premium payments. A refund is commonly defined as a return of money for an overpayment. Thus, in this context, an issued "refund," whether pursuant to Ohio Adm.Code 4123-17-73(Q), or R.C. 4123.321 and Ohio Adm.Code 4123-17-10, is a return of money an employer has paid as a workers' compensation premium. Once 100 percent of the premium paid for fiscal year 2018 had been refunded, there was no premium payment remaining for the BWC to refund. Consequently, even if the BWC makes the retrospective program calculation under Ohio Adm.Code 4123-17-73(Q) for fiscal year 2018, there is no premium payment that could be returned to relator as a refund.

{¶ 40} Accordingly, I would sustain the BWC's third objection to the magistrate's decision and deny relator's requested writ of mandamus. Because the majority grants the writ of mandamus, I respectfully dissent.

_____

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Kent Elastomer Products, Inc.,   :

            Relator,                               :

v.                                             :                    No.  21AP-387

John Logue, Interim Administrator/CEO,         :                 (REGULAR CALENDAR)
Ohio Bureau of Workers' Compensation,
                                               :
            Respondent.
                                               :

                                               :

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on February 6, 2023

---

*ROETZEL & ANDRESS, LPA*, *Douglas E. Spiker*, and *Monica L. Frantz*, for relator.

*Dave Yost,* Attorney General, and *John Smart,* for respondent.

---

IN MANDAMUS

**{¶ 41}** Relator, Kent Elastomer Products, Inc. ("relator" or "employer"), has filed this original action seeking a writ of mandamus against respondent, John Logue ("Logue"), Interim Administrator/CEO, Ohio Bureau of Workers' Compensation ("BWC"), ordering Logue to: (1) vacate the administrator's designee's ("designee") December 8, 2020, order and the adjudicating committee's ("committee") June 10, 2021, order based upon abuse of discretion and failure to follow Ohio law; (2) issue payment of

any and all refunds owed to relator under the BWC's group retrospective rating program ("program" or "group-retro"), as calculated pursuant to former Ohio Adm.Code 4123-17-73 (sometimes "group-retro rule"); (3) administer the program in accordance with the group-retro rule in former Ohio Adm.Code 4123-17-73; and (4) award relator its costs, together with such other and further relief as the court deems just and proper.

Findings of Fact:

{¶ 42} 1. Relator is a private, state-funded employer and was a participant in the program, pursuant to former Ohio Adm.Code 4123-17-73, for the policy period of July 1, 2018, through June 30, 2019.

{¶ 43} 2. Logue is the interim administrator for the BWC, which administers the program. For ease of reference, when referring to respondent in this case, "BWC" will be used in place of "Logue."

{¶ 44} 3. This case involves two major, distinct components: the program and the dividend.

{¶ 45} 4. The program: The program is a voluntary workers' compensation insurance program administered pursuant to former Ohio Adm.Code 4123-17-73. The program is designed to provide financial incentive to employer groups participating in the program through improvements in workplace safety and injured worker outcomes. In short, employers pay their own individual premiums but may receive retrospective premium adjustments, in the form of refunds or assessments, based upon the combined performance of the employer group. Specifically, under the program, each program employer pays its usual individual premium. The total premium for the entire group is the standard premium of the group and serves as a benchmark that is adjusted up or down retroactively. The BWC recalculates the group-retro premium 12 months after the end of the policy year, based on developed incurred claim losses for the whole group during the original policy year. BWC compares the group-retro premium to the standard premium. If the group-retro premium is lower than the standard premium, the BWC distributes a refund to the employers in the group, based on the percentage of the total standard premium paid by each employer. If the group-retro premium is higher, then the BWC will charge each employer in the group an assessment. The BWC then recalculates the group-

retro premium at 24 and 36 months, and issues refunds or charges assessment in the same manner.

{¶ 46} 5. The dividend: On April 10, 2020, due to the COVID-19 pandemic, the BWC board of directors approved a one-time dividend for private and public employer taxing district state-funded employers. The dividend was 100 percent of the billed premium for the period of July 1, 2018, through June 30, 2019. Also, under the board-approved plan, future evaluations including the 2018 public and private group retrospective rated policy years will not result in adjustment of the dividend or any additional credits or debits.

{¶ 47} 6. Relator received a dividend payment of $155,069.00, which was 100 percent of the premium paid for policy year 2018.

{¶ 48} 7. On June 15, 2020, relator submitted an application for adjudication hearing to the committee, contending that relator was entitled to payment of 2018 program refunds, and the BWC's decision not to issue refunds under the program was in contravention of former Ohio Adm.Code 4123-17-73.

{¶ 49} 8. On October 22, 2020, the committee held a hearing. Relator argued that the dividend policy for 2018 would harm employers who have based their financial decision to participate in the program. For example, relator asserted that, in a past dividend, when the dividend was less than 100 percent of premiums paid, the employer received more than 100 percent of premiums paid in the applicable policy year after the program refunds were issued. Relator contends that the BWC had no authority to make the change to the program, and former Ohio Adm.Code 4123-17-73 must still be followed.

{¶ 50} 9. On December 8, 2020, the committee issued an order denying the application, finding the following: (1) relator's maximum refund possible was 68 percent of standard premium; (2) relator's maximum assessment possible for policy year 2018 was 25 percent; (3) relator received 100 percent of the billed premium for the policy period of July 1, 2018, through June 30, 2019; (4) relator claimed it would be harmed financially after receiving 100 percent of the billed premium back for the 2018 policy year, asserting that in another policy year when the dividend was defined as less than 100 percent of the premium, it actually received more back than 100 percent of the premium it paid because it received the program refund in addition to the dividend; (5) Ohio Adm.Code 4123-17-23 is silent on how dividends or rebates affect an employer's participation in the program; (6) the purpose

of the program is to provide employers with an opportunity to receive retrospective premium adjustments and a premium refund for the policy year they participate; (7) for the group that relator participated in, the maximum refund possible was 68 percent of the standard premium; (8) the dividend was defined as 100 percent of the billed premium; (9) thus, 100 percent of the billed premium for this policy year was returned to relator; (10) to the committee's knowledge, this was the first time 100 percent of the billed premium was refunded; (11) relator has not been harmed financially; (12) if there was no dividend, the maximum refund possible was 68 percent, although relator stated it believed the group would have generated a 42 percent refund; that amount, plus the remaining billed premium for policy year 2018, was refunded; (13) the BWC has the authority to make practical business decisions in extraordinary situations; (14) in approving the dividend for 100 percent of the billed premium, the program was, for all practical purposes, nullified for the 2018 year for an obvious good reason; (15) the purpose of the program no longer exists for policy year 2018 due to the dividend of 100 percent of the billed premium; and (16) the refund possible by participating in the program has already been refunded. Relator appealed the order to the designee.

{¶ 51} 10. A hearing was held before the designee, and in a June 10, 2021, order, the designee denied relator's appeal, modifying the committee's factual findings and finding the following: (1) the maximum premium refund the employer could have achieved under the program was 68 percent of the premiums it paid; (2) the 68 percent refund was an aggregate refund across all three evaluation periods; (3) the first premium evaluation period was scheduled to occur 12 months after the program ended, i.e., in mid-2020; however, in April 2020, prior to the first evaluation period, BWC's board approved the dividend; (4) relator contends that depriving the employer of the benefits of the program was unfair and inequitable, and it amounted to an unlawful taking of benefits because the employer received a cash award, i.e., the April 2020 dividend, instead of a premium reduction; (5) relator received a dividend of $155,069.00, and relator believed it should have received an additional $40,000 had the BWC issued it a premium refund under the program following the first evaluation period; (6) the highest discount relator could have hoped to achieve under the program alone was 68 percent; (7) the current societal circumstances were unthinkable when the employer requested to participate in the

program in early 2018; (8) the BWC and board moved swiftly to address the effects of the COVID-19 pandemic on employers, and just one of those measures involved issuing substantial premium dividends; (9) although relator argued it would have made different business decisions had it known the BWC would have offered a premium dividend for 2018, this argument ignores that the BWC offered a number of dividends in prior policy years, and, consequently, it was foreseeable that the BWC would offer future dividends, and ignores the benefit of what the employer actually enjoyed as a result of the BWC's actions: relator did not face the possibility of owing an additional premium following the three evaluation periods, and it received every penny back it paid in premium during the 2018 policy year; (10) the BWC did not disregard the group-retro rule—the BWC is still collecting this information for historical purposes—however, for those employers that received the April 2020 dividend, the BWC will not issue refunds or premium billings from the future evaluations in light of the dividend issuance; (11) there is a clear interplay between the dividend calculation and the group-retro rule: future premium evaluations under the rule will neither reduce or enlarge the dividend, nor will the BWC debit or credit premiums following an evaluation; (12) undoubtedly, the board considered the group-retro rule in crafting the dividend calculation, and the BWC continues to perform the required group-retro premium evaluations at the scheduled intervals; in fact, for those group-retro employers who were ineligible to receive the dividend, because, as an example, they were in an inactive status at the time of the dividend snapshot, they may still receive a group-retro refund or assessment following the evaluation periods; (13) this fact, alone, is evidence the BWC continued to appropriately administer the program relative to the 2018 policy year; (14) the board decided within its authority that group-retro employers should enjoy the benefit of what amounted to a 100 percent premium dividend, in contrast to the maximum 68 percent premium refund the group could only hope to achieve for the 2018 policy year under the program, and the board afforded the group-retro employers the opportunity to avoid any premium billings following the three evaluation periods; (15) relator does not point to any language in the group-retro or dividend rules that prohibits the board from tying the calculation of the dividend to the group-retro rule, as it did here; (16) the board chose a consistent and simple option for dealing with the challenges of and impact of COVID-19 on employers in 2020; (17) the BWC considered the dividend within

the context of the program's operation, particularly with respect to the future premium evaluations, and elected to provide a dividend amounting to, generously, 100 percent of premiums paid; (18) relator claimed it was disadvantaged because it did not receive an anticipated premium refund plus the dividend, as it had in other years, totaling more than 100 percent of the premiums paid during the policy year; (19) although relator points to a new amendment to Ohio Adm.Code 4123-17-73(Q)(1)(b) that prohibits premium refunds or rebates from exceeding 100 percent of actual premiums paid for policy years after January 1, 2022, to argue that BWC lacked authority to act in the way it did prior to the amended rule change, the BWC often journalizes its past practice in the administrative rules, and it possessed broad statutory authority to set dividend criteria and eligibility, which it did through limiting language in the April 2020 dividend proposal; (20) the designee rejects relator's argument that it suffered financial harm with respect to any anticipated future refunds it could have received, because whether relator would have been entitled to assessments or refunds in the future based upon the 2018 year was speculative; and (21) relator also cannot show that it suffered financial harm from the BWC's policy because, under the program, relator could achieve no more than a 68 percent refund across the three evaluation periods, but received a full refund, plus a significant additional amount, all in a single dividend payment without having to wait several years for the program evaluations to be completed.

{¶ 52} 11. On August 3, 2021, relator filed a writ of mandamus in this court, requesting that this court order Logue, as interim administrator/CEO of the BWC, to: (1) vacate the designee's December 8, 2020, order and the committee's June 10, 2021, order based upon abuse of discretion and failure to follow Ohio law; (2) issue payment of any and all refunds owed to relator under the BWC's program, as calculated pursuant to Ohio Adm.Code 4123-17-73; (3) administer the program in accordance with Ohio Adm.Code 4123-17-73; and (4) award relator its costs, together with such other and further relief as the court deems just and proper.

Conclusions of Law:

{¶ 53} For the reasons that follow, it is the magistrate's decision that this court should grant relator a limited writ of mandamus.

{¶ 54} The Supreme Court of Ohio has set forth three requirements that must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 55} The April 10, 2020, dividend proposal by the BWC board of directors provided, in pertinent part:

> Background
>
> Governor Mike DeWine and BWC propose to pay a dividend from the State Insurance Fund to Ohio's private and public employers, a move on our part to ease the financial pressures these employers may be experiencing amid the coronavirus (COVID-19) pandemic. As in past years, the proposed dividend is possible due to our investment returns, prudent fiscal management, and the good work of employers who pay their BWC premiums and look out for the health and safety of their employees.
>
> Legal Authority
>
> Pursuant to Ohio Revised Code ("ORC") Chapter 4123.321 and Ohio Administrative Code ("OAC") Chapter 4123-17-10, BWC has the authority to issue a dividend to private and public employer taxing districts. Pursuant to rule, the Board of Directors has the discretion and authority to determine the nature of the dividend; the employers who are eligible for the dividend; the payroll period or periods to which the dividend applies; the applicable date of the dividend; and any other issues involving the dividend.
>
> Dividend Recommendation
>
> Management recommends that BWC provide a one-time 100 percent dividend to all private and public employer taxing district State Insurance Fund employers, thereby reducing the State Insurance Fund net position by up to $1.6 billion. The percentage will be applied to policy year beginning July 1, 2018 for private employers and policy year beginning January 1, 2018 for public employer taxing districts. * * *
>
> * * *

Dividend Eligibility and Calculation

If approved by the Board, the dividend recommended for Fiscal Year 2020 will be issued according to the following parameters:

* * *

c) The private employer dividend will be defined as 100 percent of billed premium for the eligible employers for the applicable policy period of July 1, 2018 through June 30, 2019.

* * *

2) Premium base for private, group retrospective rated employers will be defined as individual, experience rated premium as of April 4, 2020. Future evaluations including the 2018 public and private group retrospective rated policy years will not result in adjustment of the dividend or any additional credits or debits.

{¶ 56} The authority to issue a dividend is provided for in R.C. 4123.321 and Ohio Adm.Code 4123-17-10. R.C. 4123.321 provides:

The bureau of workers' compensation board of directors, based upon recommendations of the workers' compensation actuarial committee, shall adopt a rule with respect to the collection, maintenance, and disbursements of the state insurance fund providing that in the event there is developed as of any given rate revision date a surplus of earned premium over all losses that, in the judgment of the board, is larger than is necessary adequately to safeguard the solvency of the fund, the board may return such excess surplus to the subscribers to the fund in either the form of cash refunds or a reduction of premiums, regardless of when the premium obligations have accrued.

Ohio Adm.Code 4123-17-10 provides:

The administrator of workers' compensation, with the advice and consent of the bureau of workers' compensation board of directors, has authority to approve contributions made to the state insurance fund by employers pursuant to sections 4121.121, 4123.29, 4123.32, and 4123.34 of the Revised Code. Pursuant to sections 4123.29 and 4123.34 of the Revised Code, the administrator is required to keep premiums at the

lowest level consistent with the maintenance of a solvent state insurance fund and of a reasonable surplus. Pursuant to section 4123.321 of the Revised Code, in the event there is developed as of any given rate revision date a surplus of earned premium over all losses which, in the judgment of the bureau of workers' compensation board of directors, is larger than is necessary adequately to safeguard the solvency of the fund, the bureau of workers' compensation board of directors may return such excess surplus to the subscriber to the fund in either the form of cash refunds or a reduction of premiums, regardless of when the premium obligation has accrued. The bureau of workers' compensation board of directors shall have the discretion and authority to determine whether there is an excess surplus of premium; whether to return the excess surplus to employers; the nature of the cash refunds or reduction of premiums; the employers who are subscribers to the state insurance fund who are eligible for the cash refunds or reduction of premiums; the payroll period or periods for which a reduction of premium has accrued and the premium payment for which the reduction of premium applies; the applicable date of the cash refunds or reduction of premiums; and any other issues involving cash refunds or reduction of premiums due to an excess surplus of earned premium.

{¶ 57} Former Ohio Adm.Code 4123-17-73(Q)(1)(b), effective July 2019, provides, in pertinent part:

> (Q) The group retrospective premium calculation will occur at twelve, twenty-four, and thirty-six months following the end of the group retro policy year.
>
> (1) On the evaluation date, the bureau will evaluate all claims with injury dates that fall within the retro policy year. The incurred losses and reserves that have been established for these claims are "captured" or "frozen." The group's retrospective premium will be calculated based on the developed incurred losses of the group. The group retrospective premium will be compared to the group standard premium (the combined standard premiums of retro group members for the retro policy year as defined in paragraph (A)(11) of this rule) and all subsequent group retro refunds/assessments. The difference will be distributed or billed to employers as a refund or assessment.

{¶ 58} Ohio Adm.Code 4123-17-73(Q)(1)(b), effective September 2021, provides, in pertinent part:

> (Q) The group retrospective rating premium calculation will occur at twelve, twenty-four, and thirty-six months following the end of the group retrospective rating policy year.
>
> (1) On the evaluation date, the bureau will evaluate all claims with injury dates that fall within the retro policy year. The incurred losses and reserves that have been established for these claims are "captured" or "frozen." The group's retrospective premium will be calculated based on the developed incurred losses of the group. The group retrospective rating premium will be compared to the group standard premium, which is the combined standard premiums of retro group members for the retro policy year as defined in paragraph (A)(11) of this rule and all subsequent group retrospective rating refunds and assessments. The difference will be distributed or billed to employers as a refund or assessment.
>
> * * *
>
> (b) *Effective with policy years beginning on or after January 1, 2022, premium refunds or premium rebates provided to group retrospective rating employers for a policy year may not exceed, in their cumulative total, one hundred percent of the actual premium following reporting of actual payroll and reconciliation of estimated premium and actual premium in accordance with paragraph (M) of this rule.*

(Emphasis added.) Ohio Adm.Code 4123-17-73(Q)(1)(b).

{¶ 59} In the present case, relator argues that it is entitled to a writ of mandamus because the BWC failed to follow Ohio law and abused its discretion when it decided not to issue any refund owed to employers enrolled in the program for policy year 2018. Relator contends that the BWC rationalized that it would not issue refunds under the program for the 2018 policy year because the dividend equaled 100 percent of the premium paid for that year; however, at the time of the dividend, the administrative rules did not limit a program employer from recovering premium refunds as a result of receiving a dividend, even if the employer's receipt of a dividend resulted in the recovery of an amount exceeding 100 percent of the premium paid. Relator asserts that the BWC circumvented administrative rulemaking procedures when it disregarded the program and points out that, after relator challenged the BWC's decision, the BWC proposed an amendment to Ohio Adm.Code 4123-17-73 that capped the recovery for a program participant at 100 percent of the premium

paid, which relator claims proves that the BWC had no authority to refuse to issue refunds to 2018 program participants in absence of the amended language.

{¶ 60} There is no dispute that the BWC had the authority to issue the 2020 dividend pursuant to R.C. 4123.321 and Ohio Adm.Code 4123-17-10. The crux of the matter in this case is whether the BWC was within its authority to alter the rules governing the program for the 2018 year and not issue any refunds under the program as a result of the dividend.

{¶ 61} Like all statutorily created agencies, BWC can exercise only those powers conferred upon it by the General Assembly. *See State ex rel. Cincinnati v. Ohio Civ. Rights Comm.*, 2 Ohio App.3d 287, 288 (10th Dist.1981). It must conform its operations to the procedures set out in the statutes or rules adopted pursuant to statutory authority. *Id.* Additionally, BWC must follow its rules, as written. *State ex rel. H.C.F., Inc. v. Ohio Bur. of Workers' Comp.*, 80 Ohio St.3d 642, 647 (1998). It may not give selective effect to provisions to produce a desired result or change its rules without complying with the rule-making procedures in R.C. Chapter 119. *Id.* To be entitled to deference, an agency's interpretation of its governing statutes or rules must be consistent with the plain language of the applicable statutes or rules. *Athens Cty. Bd. of Commrs. v. Schregardus*, 83 Ohio App.3d 861, 868 (10th Dist.1992).

{¶ 62} R.C. 119.03 provides certain procedures that an agency must comply with in order to adopt rules. To ensure adequate public participation, R.C. Chapter 119 requires, among other protections, public notice, publishing the proposed rule, the opportunity for public comment, and a public hearing before agency rules can be validly imposed. *Id.* R.C. 119.02 provides that the failure of any agency to comply with the proper procedures shall invalidate any rule adopted by the agency.

{¶ 63} In *Ohio Nurses Assn., Inc. v. Ohio State Bd. of Nursing Edn. & Nurse Registration*, 44 Ohio St.3d 73 (1989), the Supreme Court of Ohio addressed the BWC's rulemaking authority:

> In adopting a "rule," an agency is required to comply with the promulgation procedure set forth in R.C. Chapter 119. See R.C. 119.02. "Rule" is defined in R.C. 119.01(C) as "* * * *any rule, regulation, or standard, having a general and uniform operation, adopted, promulgated, and enforced by any agency under the authority of the laws governing such agency*, and includes any appendix to a rule. 'Rule' does not include any internal management rule of an agency unless the

internal management rule affects private rights." (Emphasis added.)

Upon a careful review of the position paper set forth in footnote one, supra, we find that it meets the foregoing statutory definition of "rule" as determined by the General Assembly. As appellants point out, the position paper enlarges the scope of practice for LPNs, and regulates those LPNs qualified to start IVs by requiring a post-licensure course of study. Additionally, it is readily apparent that the position paper is intended to have a uniform application to all LPNs in the state of Ohio.

(Emphasis in original.) *Id.* at 75.

{¶ 64} Furthermore, in *Ohio Podiatric Med. Assn. v. Taylor*, 10th Dist. No. 11AP-916, 2012-Ohio-2732, this court addressed whether an Ohio Department of Insurance ("ODI") letter and legal memorandum illegally adopted administrative rules. The court in *Ohio Podiatric* explained:

" 'It is the effect of the [document], not how the [agency] chooses to characterize it,' " that determines whether a document issued from an agency constitutes a rule. *State ex rel. Saunders v. Indus. Comm.*, 101 Ohio St.3d 125, 2004 Ohio 339, ¶ 26, 802 N.E.2d 650, quoting *Ohio Nurses Assn., Inc. v. Ohio State Bd. of Nursing Edn. & Nurse Registration*, 44 Ohio St.3d 73, 76, 540 N.E.2d 1354 (1989). "The pivotal issue in determining the effect of a document is whether it enlarges the scope of the rule or statute from which it derives rather than simply interprets it." *Saunders* at ¶ 27, citing *Ohio Nurses; OPUS III-VII Corp. v. Ohio Bd. of Pharmacy*, 109 Ohio App.3d 102, 113, 671 N.E.2d 1087 (10th Dist.1996). "If the former, it must be promulgated pursuant to R.C. Chapter 119. If the latter, it is exempt from those requirements." *Id.*

To illustrate the distinction, the Supreme Court in *Saunders* compared the documents at issue in *Ohio Nurses* with those in *OPUS*. In *Ohio Nurses*, "the State Nursing Board issued a 'position paper' that greatly expanded the authority of licensed practical nurses ('LPNs') to administer intravenous fluids or 'IVs.' " *Saunders* at ¶ 28. The court determined the position paper was a rule, subject to the R.C. Chapter 119 promulgation requirements, "because it expanded the scope of LPN practice[,] * * * regulated those LPNs qualified to start IVs by requiring additional course work," and "'establish[ed] a new rule, standard or regulation regarding LPN practice.' "

> Id. at ¶ 29-30, quoting *Ohio Nurses* at 76. *See also Livisay v. Ohio Bd. of Dietetics*, 73 Ohio App.3d 288, 596 N.E.2d 1129 (10th Dist.1991).
>
> In *OPUS*, the Ohio State Board of Pharmacy responded to an inquiry from one of its licensed distributors regarding whether the distributor could return unused medication dispensed in an OPUS container to a pharmacy for credit. *Saunders* at ¶ 36; *OPUS* at 106-07. Construing the term "unopened" in Ohio Adm.Code 4729-9-04, the board determined that whether an OPUS container had been opened was impossible to ascertain, prompting the board to conclude "medication dispensed in OPUS containers could not be returned and redispensed." *Saunders* at ¶ 36. "OPUS objected, arguing that the board had implicitly added the requirement that packaging be 'tamper-evident,' and, in so doing, created a new rule without complying with R.C. Chapter 119." *Saunders* at ¶ 37. The *OPUS* court concluded that, in contrast to the document in *Ohio Nurses*, the pharmacy board's letter "merely interpreted the language used in an existing rule, but did not establish a new rule, standard or regulation." *Id.* at 113.
>
> Here, the November 2005 letter and the December 2008 legal memorandum interpreted the language used in R.C. 3923.23, but did not purport to expand duties or establish a new rule, regulation, or standard. Moreover, ODI's interpretation of R.C. 3923.23 is consistent with the language of the statute. See *OPUS* at 113, citing *Jones Metal Prods. Co. v. Walker*, 29 Ohio St.2d 173, 181, 281 N.E.2d 1 (1972). Because the documents do no more than apply the plain language of the statute, plaintiffs do not demonstrate a violation of ODI's rule-making authority.

*Id.* at ¶ 35-38.

{¶ 65} In the present case, the magistrate finds the BWC acted without authority to alter the rules governing the program for the 2018 year and not distribute any refunds or charge any assessments under the program as required by former Ohio Adm.Code 4123-17-73. The "will" language in former Ohio Adm.Code 4123-17-73(Q)(1) makes mandatory the BWC's obligation to distribute refunds or charge assessments to employers involved in the program after calculating the group retrospective rating premium at the required intervals, evaluating all claims within the policy year, and comparing the group retrospective rating premium to the group standard premium. There are no applicable

exceptions provided in the rule with respect to dividend distribution in former Ohio Adm.Code 4123-17-73, and Ohio Adm.Code 4123-17-10 does not even mention the program, much less prohibit a program employer from receiving a refund when the dividend resulted in the employer's recovery of an amount exceeding 100 percent of the premium paid. In sum, neither Ohio former Adm.Code 4123-17-73 nor Ohio Adm.Code 4123-17-10 place any limitations on receipt of program refunds when a dividend is issued. The BWC was required to follow its rules as written and the plain language employed therein. The BWC failed to do so in this case.

{¶ 66} The April 10, 2020, dividend proposal by the BWC board of directors attempted to modify the BWC's obligations imposed by former Ohio Adm.Code 4123-17-73(Q)(1). However, the BWC was prohibited from changing its rules without complying with the rulemaking procedures in R.C. 119. *See H.C.F., Inc.* at 647. As explained above in *Ohio Nurses*, "rule" is defined in R.C. 119.01(C) as a rule, regulation, or standard having a general and uniform operation but does not include any internal management rule of an agency unless the internal management rule affects private rights. The court in *Ohio Nurses* found that the document in that case constituted a "rule" because it enlarged the scope of practice for LPNs, regulated those LPNs qualified to start IVs by requiring a post-licensure course of study, and was intended to have a uniform application to all LPNs in Ohio. Likewise, the court in *Ohio Podiatric* found an ODI letter and legal memorandum did not illegally adopt administrative rules, explaining the effect of a document determines whether it enlarges the scope of the rule or statute from which it derives rather than simply interprets it, and finding the letter and legal memorandum in that case merely interpreted the plain language used in R.C. 3923.23, but did not purport to expand duties or establish a new rule, regulation, or standard.

{¶ 67} Here, the April 10, 2020, dividend proposal introduced a regulation that had a general and uniform operation upon all of the program participants and affected the rights of those participants, and it was not simply an internal management rule. The proposal altered how the program operated and changed the refund and assessment structure adopted under former Ohio Adm.Code 4123-17-73(Q)(1). The BWC's proposal did not merely interpret former Ohio Adm.Code 4123-17-73(Q)(1) but changed the mandatory obligation of the BWC to distribute any refund owed to employers enrolled in the program

for policy year 2018. The program language, as set forth in former Ohio Adm.Code 4123-17-73(Q)(1), did not limit an employer participant from recovering premium refunds as a result of receiving a dividend, even if the employer's receipt of a dividend resulted in the recovery of an amount exceeding 100 percent of the premium paid. The proposal and subsequent BWC actions attempted to place such a limitation on the program without the requisite rulemaking procedure in R.C. 119.

{¶ 68} Neither the committee nor the designee provided any viable rationale to escape the mandatory program language in former Ohio Adm.Code 4123-17-73(Q)(1) or the rulemaking procedures in R.C. 119. The committee indicated that the BWC has the authority to make practical business decisions in extraordinary situations, without citation to any authority. Furthermore, the BWC's actions here amounted to more than a business decision; instead, the BWC ignored a written administrative rule and statutory rulemaking requirements.

{¶ 69} In addition, the committee claimed that the BWC was permitted to change the obligations under former Ohio Adm.Code 4123-17-73(Q)(1) because an obvious good reason existed (the negative business impact from COVID-19). Similarly, the designee found that the societal circumstances were unthinkable when the employer requested to participate in the program in early 2018; the BWC and board moved swiftly to address the effects of the COVID-19 pandemic on employers; and the board chose a consistent and simple option for dealing with the challenges of and impact of COVID-19 on employers in 2020. However, there was no support or authority cited providing that the detriment to businesses as a result of COVID-19, an "obvious good reason," or unexpected societal circumstances may constitute valid exceptions to former Ohio Adm.Code 4123-17-73(Q)(1) and R.C. 119. These are public-policy considerations, which do not alter the plain reading of the unambiguous statutory and regulatory language here. *See Elliot v. Durrani*, ___ Ohio St.3d ___, 2022-Ohio-4190, ¶ 19, quoting *State ex rel. Paluch v. Zita*, 141 Ohio St.3d 123, 2014-Ohio-4529, ¶ 13 (when the statutory language is unambiguous, a court must apply it as written without resorting to considerations of public policy); *Gabbard v. Madison Local School Dist. Bd. of Edn.*, 165 Ohio St.3d 390, 2021-Ohio-2067, ¶ 13, citing *Zumwalde v. Madeira & Indian Hill Joint Fire Dist.*, 128 Ohio St.3d 492, 2011-Ohio-1603, ¶ 23-24, 26 (same). *See also State ex rel. United Auto Aerospace & Agricultural Implement Workers*

*of Am. v. Ohio Bur. of Workers' Comp.*, 95 Ohio St.3d 408, 2002-Ohio-2491, ¶ 6-10 ("*UAW*") (rejecting the BWC's policy argument that approving the BWC's action to grant a premium credit without first promulgating rules pursuant to R.C. 119 is the "right" thing to do).

**{¶ 70}** The committee also claimed that relator had suffered no financial harm. Relator contests this and contends it would have likely been entitled to receive an additional $70,000 in premium refunds when the 24-month and 36-month evaluation periods are considered. Regardless, even if the committee was correct, such does not automatically grant the BWC a pass to escape the mandatory provisions of former Ohio Adm.Code 4123-17-73(Q)(1) and the rulemaking requirements of R.C. 119. *See, e.g., UAW* at ¶15 (finding that despite relator's concerns now being moot because the BWC has enacted a rule in compliance with the statute, compelling a public figure to obey the law and properly promulgate a rule pursuant to R.C. 119 is sufficient grounds for pursuing an action, as the rule of law must not be compromised, and in no instance is the rule of law more vital than when it regulates governmental activity).

**{¶ 71}** Finally, the designee's rationale that relator failed to point to any language in the group-retro or dividend rules that prohibits the board from tying the calculation of the dividend to the group-retro rule, as it did here, is without merit. As explained above, the BWC can only act pursuant to authority it has been granted and must follow the plain language of its own administrative rules. If the board desired to tie the calculation of the dividend to the program, it could have instituted a rule providing for such utilizing the proper rulemaking procedures in R.C. 119.

**{¶ 72}** For these reasons, the magistrate finds that the BWC abused its discretion when it issued the committee's December 8, 2020, order and the designee's June 10, 2021, order. The BWC failed to follow the mandate of former Ohio Adm.Code 4123-17-73(Q)(1) that requires it to distribute any refunds or charge any assessments to employers enrolled in the program for policy year 2018.

**{¶ 73}** Accordingly, the magistrate recommends that this court grant relator a limited writ of mandamus. The orders of the committee and designee are vacated, and the matter is remanded to the BWC to administer the program as required by former Ohio

Adm.Code 4123-17-73(Q), and to distribute a refund or charge an assessment consistent with the requirements of former Ohio Adm.Code 4123-17-73(Q).


/S/ MAGISTRATE
THOMAS W. SCHOLL III


**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).